IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELAVON, INC.<br><br>Plaintiff,<br><br>v.<br><br>NORTHEAST ADVANCE TECHNOLOGIES, INC., ESTEBAN CASTILLO, JOHN DOES 1-50 and ABC COMPANIES 1-50,<br><br>Defendants. | Civil Action No.: 7:15-cv-7985-KMK-PED<br><br>**COMPLAINT** |

Plaintiff Elavon, Inc. ("Plaintiff"), by and through its undersigned counsel, as and for its complaint against defendants Northeast Advance Technologies, Inc. ("Northeast"), Esteban Castillo ("Castillo" and, with Northeast, the "Northeast Defendants"), John Does 1-50 (the "Doe Defendants") and ABC Companies 1-50 (the "ABC Companies") (collectively, the "Defendants") alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for damages arising from the Northeast Defendants' breach of contract and breach of guaranty related to contractual obligations regarding credit card processing services and the funding of payment card transactions, as well as for the Defendants' collective wide-ranging scheme to defraud Plaintiff out of potentially millions of dollars.

2. Although the specific components of the scheme are not as yet fully and completely known to the Plaintiff, this Complaint alleges the salient outline of Defendants' nefarious scheme operating within the various payment card networks and against the Plaintiff. Plaintiff reserves

all rights to move the Court for leave to amend the Complaint following a period of comprehensive discovery.

## THE PARTIES

3. At all relevant times herein, Plaintiff was, and remains, a corporation duly organized and existing pursuant to the laws of the State of Georgia authorized to transact business within the State of New York.

4. Upon information and belief, defendant Northeast is a corporation organized and existing pursuant to the laws of the State of New York, located in Cornwall, Orange County. Northeast purported to Plaintiff that it is in the business of manufacturing engraving plates.

5. Upon information and belief, defendant Castillo is an individual residing in the State of New York, in or about Orange County.

6. Upon information and belief, at all relevant times mentioned herein, each Defendant was the agent, servant and/or employee of each of the remaining Defendants and at all times alleged herein was acting within the course and scope of said agency and/or employment.

7. Plaintiff is currently without knowledge and information of the true names and capacities of the Doe Defendants, and therefore sues these defendants by such fictitious names. Plaintiff reserves all rights to seek leave of the Court to amend this Complaint to allege their true names and capacities when ascertained.

8. Plaintiff is currently without knowledge and information of the true names and status of the entities named as the ABC Companies, and therefore sues these defendants by such fictitious names. Plaintiff reserves all rights to seek leave of the Court to amend this Complaint to allege their true names and capacities when ascertained.

## SUBJECT MATTER JURISDICTION

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are each citizens of different States, namely Georgia and New York, respectively, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10. Plaintiff believes that this Court is also likely to have subject matter jurisdiction pursuant to 28 U.S.C. § 1331 inasmuch as one or more of the Defendants is likely to have violated one more laws of the United States. Plaintiff's request to the Court for leave to amend the Complaint subsequent to discovery will likely contain numerous additional causes of action.

11. Plaintiff requests that the Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims that are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy pursuant to Article III of the United States Constitution.

## VENUE

12. Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in the Southern District of New York because at least one defendant maintains its principal place of business in Orange County, New York and, upon information and belief, each of the other defendants are residents of the State of New York.

13. Alternatively, venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

**A.      Plaintiff And Northeast Enter Into A Contract For Credit Card Processing**

14.     Plaintiff and Northeast entered into a written contract, entitled "Merchant Application", incorporating by reference a Terms of Service and a Merchant Operating Guide (collectively hereinafter, the "Contract").  A true and correct copy of the Contract is annexed hereto as Exhibit 1.   Northeast signed the Contract in or about May 2011.

15.     The purpose of the Contract was to establish a relationship between Plaintiff and Northeast pursuant to which Plaintiff would process Northeast's authorized credit card transactions serving as a form of payment accepted by Northeast for the sale of goods or services.

16.     At all times relevant herein, Plaintiff fully performed, or was excused from performing, all of the conditions of the Contract required to be performed by Plaintiff.

17.     Plaintiff provided Defendant with merchant access into the VISA and MasterCard payment networks pursuant to the Contract.  Defendant has breached the terms of the Contract with the Plaintiff as set forth below.

18.     Pursuant to the terms of the Contract, Northeast was obligated to pay Plaintiff for incoming customer chargebacks occasioned by transactions that were processed, and funded card transactions disputed by the Defendant's customers or their card issuing banks.  Between April 2015 and July 2015 (the "Relevant Time Period"), suspect transactions or disputed transactions were presented back to and processed through Plaintiff, which resulted in substantial numbers of inexplicable customer disputes and chargebacks to the Northeast card processing account. Additionally, Northeast was obligated to pay Plaintiff for additional incurred chargeback fees pursuant to the Contract.   The aggregate amount Northeast owes to Plaintiff as of the date of this Complaint is $1,906,024.22.

19.     Prior to the commencement of this action, Plaintiff demanded that Northeast repay the amount then due.  This sum was due and owing pursuant to the terms and conditions governing payment of chargebacks within the Contract at the time of Plaintiff's demand for payment.

20.     No part of said sum has been paid, and there is now due, owing and unpaid from Northeast to Plaintiff the above-referenced amount, together with interest thereon at the legal rate from the date of breach.

21.     The Contract also provides for payment of costs and of attorney fees, for any cause of action arising thereunder.  Such costs and fees are due and owing in a sum to be proven at the time of trial.

B.     **Plaintiff And Castillo Enter Into A Guaranty Agreement**

22.     To induce Plaintiff to furnish the above-referenced merchandise and/or services to Northeast, defendant Castillo, purporting to be Northeast's President, individually subscribed to a Personal Guaranty (the "Guaranty"), whereby he guaranteed payment of any sums due and owing to Plaintiff on account of the Contract.  The Guaranty was an included material element of the Contract.  (*See* Exhibit 1 hereto).

23.     Demand has been made upon Castillo, as the guarantor, to pay the amount due and owing, but payment has not been made.  By reason of this breach, Castillo is indebted to Plaintiff in the sum of $1,906,024.22, together with interest thereon at the legal rate from the date of the breach.

C.     **Plaintiff Incurs Vast Chargeback Amounts On Northeast's Account**

24.     A "chargeback" is a reversal of a transaction between a merchant and a credit card holder evidenced by some type of dispute between the customer and the merchant, which results in

the Plaintiff, pursuant to the applicable payment card network rules, reimbursing the card issuing bank the dollar amount of a disputed transaction that had been previously settled and paid by the Plaintiff to the Defendant for what was presented as an actual payment card transaction. Chargebacks to a merchant's card processing account typically occur for reasons having to do with a merchant's failure to provide goods or services as agreed between it and its customer and credit card holder.

25. During the Relevant Time Period, the account established by Northeast was inexplicably the subject of a large volume of chargeback transactions.

26. Pursuant to, *inter alia*, VISA and MasterCard regulations, Plaintiff, as Northeast's credit card processor, bore full pecuniary responsibility for its incoming chargebacks to the card issuing banks, irrespective of Northeast's financial capacity to make refunds to credit card holders. Thus, Plaintiff was required to make refunds of amounts that credit card holders paid to Northeast notwithstanding the fact that Northeast did not maintain sufficient reserves for Plaintiff to immediately recoup for itself the amount of the refunds.

27. The imbalance between the total amount refunded by the Plaintiff to the card issuing banks submitting disputes and chargebacks during the Relevant Time Period and Northeast's account balance with Plaintiff represents the amount sought pursuant to the causes of action for breach of contract and breach of guaranty set forth below.

**D.     Plaintiff Believes That Northeast's Charge-Backs Are Part Of An Intricate Scheme To Defraud It And Other Entities**

28. Plaintiff's investigation of the circumstances surrounding Northeast's multiple chargebacks of what had been represented as lawful payment card transactions revealed the likely

existence of wide-ranging fraudulent scheme orchestrated against it by a number of individuals and involving commercial banking entities and multiple colluding credit card holders.

29.     This type of scheme begins with credit card holders making sizable "purchases" from a merchant, often in the amount of $20,000 or more.

30.     Upon information and belief, in reality, however, the "purchases" are a sham and involve no legitimate exchange of goods or services between the merchant and the credit card holders whose transactions were subsequently disputed.  Rather, the merchant simply receives, to use the above example, $20,000 in its account from the issuer of the credit cards.

31.     At least one benefit to the "merchant" of these transactions is to obtain easy access to a source of interest-free funding for the time period before the credit card holders are required to pay their credit card bill, inclusive of a grace period, usually approximately thirty days.  During this thirty-day period, the merchant may, for example, purchase inventory or make short term loans to others.  At the conclusion of the thirty-day period, the merchant "repays" the credit card holders by wiring funds in the amount of the original transaction back to the credit card holders or to the card issuing bank, who, in turn, use those funds to pay their credit card bills for the original transaction.

32.     The usual benefit to the credit card holders of this scheme is to obtain access to various incentives offered by credit card issues to high-level users, including, for example, cash back, reward points, frequent flyer miles, or other benefits outlined in their respective card usage agreements.

33.     This type of scheme unravels if there is any change to the balance of the relationship, i.e., the sham merchant is unable to "repay" the existing credit card holders because it

is unable to pay back existing obligations to credit card holders and/or cannot obtain the cooperation of additional credit card holders to keep its scheme afloat.

34. However, in the event that the scheme unravels, the credit card holders are not left without options. Instead, they typically contact their credit card issuing bank and complain that the "merchant" failed to provide the goods or services agreed upon, and as a result the subject transactions should be reversed and the credit card holders should be credited the disputed transaction amounts.

35. The credit card issuers then request chargebacks pursuant to VISA, MasterCard or other payment card network dispute rules, and the involved merchant's credit card processor becomes liable, per the processing rules, to the credit card issuer. Upon information and belief, a sham merchant often assists and supports the colluding credit card holders' chargebacks by confirming to the credit card issuers that the promised goods or services were not, in fact, provided, notwithstanding the fact that there were no goods or services exchanged in the first place in connection with the original payment card transaction.

36. In a variation of this scheme, upon information and belief, the merchant "repays" a credit card holder by wire transfer from its bank account, but then asserts to its bank that the wire transfer was not authorized. As a result, the merchant's bank rescinds the wire transfer. The merchant then transfers the funds to another account (unrelated to the transferring account), and leaves the credit card holder with no funds with which to pay his or her credit card bill. That leaves the credit card holder with the option of either paying the credit card bill using his or her own funds, or initiating a chargeback process as explained above, again usually with the sham merchant's advice, assistance and documentary support.

**E.      Plaintiff Believes It Was A Victim Of The Northeast Defendants' Fraudulent Scheme**

37.     Plaintiff believes that it was the victim of the type of scheme described above, or of one of its many variations.

38.     Using the archetype described above, upon information and belief, Northeast was a sham merchant who set up an account with Plaintiff in May 2011.  Beginning shortly thereafter, the Northeast Defendants began making ever-increasing credit card transactions.  At the beginning of the Relevant Time Period, Northeast could no longer maintain its scheme and, as a result, credit card holders who supposedly did business with Northeast began making chargebacks that ultimately resulted in a substantial financial detriment to Plaintiff.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

39.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

40.     Plaintiff and Northeast entered into the Contract for the purpose of Plaintiff becoming Northeast's credit card processor.

41.     Northeast breached its contract with Plaintiff by failing to compensate it for numerous chargebacks presented against the Northeast card processing account, as well as associated charge-back fees provided for in the Contract.

42.     Plaintiff has complied with its contractual obligations to Northeast, or has been properly excused therefrom.

43.     As a result of Northeast's breach of contract, Plaintiff has been damaged.

## SECOND CAUSE OF ACTION
### (Breach of Guaranty)

44. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

45. Castillo induced Plaintiff to enter into the Contract by personally guaranteeing repayment of Northeast's debts arising from breach of the Contract by Northeast.

46. Plaintiff has demanded from Castillo to pay the amount due and owing, but Castillo has refused.

47. As a result of Castillo's failure to abide by the Guaranty, Plaintiff has been damaged.

## THIRD CAUSE OF ACTION
### (Common Law Fraud And Fraud In The Inducement)

48. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

49. Beginning in or about May 2011 and continuing through July 2015, the Northeast Defendants colluded with the Doe Defendants and ABC Companies to misrepresent to Plaintiff the nature of transactions between Northeast, the Doe Defendants and ABC Companies.

50. Upon information and belief, Castillo and one or more of the Doe Defendants and/or ABC Companies created Northeast for the purpose of defrauding Plaintiff.

51. Specifically, the Defendants represented to Plaintiff that their mutual transactions were legitimate exchanges of funds for goods and/or services.

52. Castillo and one or more of the Doe Defendants and/or ABC Companies intentionally induced Plaintiff to enter into the Contract for the purpose of running its scheme until conclusion.

53. Upon information and belief, the transactions between Northeast and the Doe Defendants and ABC Companies were a sham that constituted a scheme to defraud Plaintiff and others.

54. Upon information and belief, the Doe Defendants and ABC Companies were at least aware of the Northeast Defendants' scheme and/or were active participants in their scheme.

55. Plaintiff materially and continually justifiably relied upon Defendants' misrepresentations.

56. Plaintiff was injured by reason of Defendants' improper acts.

### FOURTH CAUSE OF ACTION
**(Recovery Pursuant to *Quantum Meruit*)**

57. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

58. Plaintiff conferred a considerable benefit on the Defendants by providing credit card processing services to them.

59. Defendants have failed to make compensate Plaintiff fully for the substantial benefit conferred on them by Plaintiff.

### FIFTH CAUSE OF ACTION
**(Recovery Pursuant to Unjust Enrichment)**

60. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

61. Defendants derived significant revenue from their fraudulent scheme.

62. Based on Defendants' failure and refusal to compensate Plaintiff for its losses, Defendants would be unjustly enriched if they are not obligated to compensate Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against BMS:

(1) On the First, Second, Third, Fourth and Fifth Causes of Action, awarding Plaintiff compensatory damages in an amount to be determined at trial for all losses suffered as a result of the acts and transactions complained of above, together with prejudgment interest from the date of the wrongs to the date of judgment;

(2) On the Third Cause of Action, awarding Plaintiff punitive damages as a result of the Defendants' egregious actions, in an amount to be determined at trial for all losses suffered as a result of the acts and transactions complained of above; and

(3) Such other and further relief as the Court deems just and proper.

Dated: October 9, 2015

          **PODVEY, MEANOR, CATENACCI, HILDNER,
COCOZIELLO & CHATTMAN, P.C.**

By: /s/ *Daniel Ginzburg*
     Daniel Ginzburg (DG-2824)
     The Legal Center
     One Riverfront Plaza, Suite 800
     Newark, New Jersey 07102
     Tel: 973-623-1000
     *Attorneys for Plaintiff Elavon, Inc.*