UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

ELAVON, INC.,                                              :
                                                          :
                              Plaintiff,                  :
                                                          :
        -v-                                               :          15-cv-7985 (KBF)
                                                          :
NORTHEAST ADVANCE TECHNOLOGIES,        :          OPINION & ORDER
INC., SAMUEL BRACH, JOSHUA BRACH,        :
ELIEZER KOHEN, ESTEBAN CASTILLO,         :
JOEL FRIEDMAN, RIVKY FRIEDMAN,           :
SILVERSTONE WIRELESS, LLC d/b/a J R       :
CLOSEOUTS, MOSHE KESTENBAUM, JOEL :
FRIEDLANDER, MENACHEM WEISS,             :
HINDY WEISS, CUBITAC CORP., JOSEPH      :
RUBIN, DOVID KAPLAN, JOSHUA WEIDER, :
HAVA REICHMAN, ALEX LOWY, D-TECH        :
MANAGEMENT COMPANY INC., JOHN           :
DOES 1-50 and ABC COMPANIES 1-50,         :
                                                          :
                              Defendants.                 :
                                                          :
------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 27, 2017

KATHERINE B. FORREST, District Judge:

        On October 9, 2015, Elavon, Inc. ("Elavon" or "plaintiff"), a credit card
processor, filed a complaint alleging a fraudulent credit card "chargeback" scheme
that cost it over two million dollars. This is plaintiff's third bite at the apple; the
Second Amended Complaint alleges violations of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, as well as common law

fraud, breach of contract, unjust enrichment, and conspiracy.[1]  (Second Am. Compl. ("SAC") (ECF No. 75) ¶¶ 119-84.)  Specifically, plaintiff has asserted nine counts:

1. Breach of contract against Northeast Advance Technologies, Inc. ("Northeast") (Count I);

2. Breach of guaranty against Esteban Castillo (Count II);

3. Operating a business using funds derived from racketeering activity, in violation of 18 U.S.C. § 1962(a), against Northeast Defendants, Joel Friedman, Rivky Friedman, Silverstone Wireless ("JR"), Menachem Weiss, Hindy Weiss, Cubitac Corp. ("Cubitac"), and D-Tech Management Company ("D-Tech") (Count III);

4. Acquiring and maintaining an interest in an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b), against Northeast Defendants, J. Friedman, R. Friedman, JR, M. Weiss, H. Weiss, Cubitac, and D-Tech (Count IV);

5. Participating in the conduct of an enterprise engaged in a pattern of racketeering, in violation of 18 U.S.C. § 1962(c), against all defendants (Count V);

6. Conspiracy to violate 18 U.S.C. § 1962(a)-(c), in violation of 18 U.S.C. § 1962(d), against all defendants;

---

[1] Northeast Advance Technologies, Inc., Samuel Brach, Joshua Brach, Eliezer Kohen, and Esteban Castillo are hereinafter referred to as "Northeast Defendants."  The Doe Defendants, Joel Friedman, Rivky Friedman, Silverstone Wireless d/b/a JR Closesouts, Moshe Kestenbaum, Joel Friedlander, Menachem Weiss, Hindy Weiss, Cubitac Corp., Joseph Rubin, Dovid Kaplan, Joshua Weider, Hava Reichman, and Alex Lowy are hereinafter referred to as "Cardholder Defendants."

7. Fraudulent misrepresentation against Northeast Defendants and Cardholder Defendants (Count VII);

8. Unjust enrichment (Count VIII); and

9. Conspiracy (Count IX).[2]

Pending before the Court are five motions to dismiss, collectively, Counts III, IV, V, VI, VII, VIII, and IX, filed by various of the named defendants.[3] (ECF Nos. 114, 118, 119, 123, 125, 129.[4]) For the reasons described below, those motions are GRANTED.

I.   BACKGROUND

The factual allegations below are drawn from the SAC and assumed true for purposes of this motion.

A.  The Parties and the Contract

Elavon, a subsidiary of U.S. Bank National Association, is a credit card processor. (SAC ¶ 69.) It provides merchants with access to the VISA, MasterCard, American Express, and Discover payment networks and connects them to their customers' issuing banks for payment. (Id. ¶¶ 3, 44.) Northeast has allegedly "portrayed itself as a manufacturer of engraving plates, a producer of acupuncture and tattoo needles, a computer programming firm, a maker of metal writing

---

[2] The SAC does not specify which defendants are being sued under Counts VIII and IX. (See SAC ¶¶ 178-84.) The Court construes the claim as alleged against all defendants.
[3] Defendants Kohen and Friedlander did not file motions to dismiss, nor did they have counsel enter appearances in this matter. Nevertheless, the Court dismisses all claims against Kohen and Friedlander, as there are no facts alleged that separate them from the other cardholder defendants, all of whom are dismissed from this case pursuant to this Opinion.
[4] The Court notes that ECF Nos. 118 and 119 appear to be duplicates, and will refer to both as ECF No. 118.

instruments, and a fabricator of 'faceted diamond scribers for the semi-conductor industry.'" (Id. ¶ 78.) Elavon claims it entered into a contract ("Merchant Application") in May 2011 with Northeast, which is run by defendants S. Brach, J. Brach, Kohen, and Castillo. (Id. ¶¶ 9-11, 51, 54; see also id., Ex. 1.) Elavon asserts that the Merchant Application incorporated by reference Elavon's Terms of Service and a Merchant Operating Guide (collectively, the "Contract"). (Id. ¶ 41.) An "included material element of the Contract" was the guaranty promised by Castillo, who allegedly represented himself as Northeast's President. (Id. ¶ 51.)

According to the SAC, the Contract established a relationship between Elavon and Northeast, whereby Elavon was to serve as a credit card processor for transactions in Northeast's normal course of business. (Id. ¶ 42.) The Contract also obligated Northeast to reimburse Elavon for "chargebacks" when customers disputed transactions with their issuing banks and Elavon facilitated returns of their payments. (Id. ¶¶ 42, 45.)

B. Credit Card Processors and Chargebacks Generally

Because plaintiff's core allegation rests on a purported "chargeback scheme" in which defendants defrauded plaintiff, an explanation of the role of credit card processors may be instructive. The Court here provides a brief overview based on plaintiff's allegations in the SAC.

Credit card processors like Elavon act as intermediaries between banks that issue credit cards and merchants that sell goods by providing access to credit card networks such as VISA and MasterCard. (Id. ¶ 42, 44.) Processors are bound by

4

rules established by the credit card networks.  (Id. ¶ 69.)  Typically, when a consumer buys something using a credit card, the merchant relays the transaction to the processor, which transmits the transaction to the issuing bank; the consumer's account is debited, and the funds are transferred back down the chain, through the processor, to the merchant's account.  (Id. ¶¶ 90-91.)

As particularly relevant here, when a transaction is cancelled by a merchant that, for example, failed to produce a promised good, a "chargeback" may be initiated by the consumer.  This is a "reversal of a transaction between a merchant and a customer credit card holder resulting from a dispute between the customer and the merchant."  (Id. ¶ 46; see also id., Ex. 1 ("Contract") at 42 (defining "chargeback").)  Often, merchants and customers are able to resolve the dispute and initiate a return, but consumers can make the request to their issuing bank, which can then initiate the chargeback.  (Id.)  When a consumer makes a claim for a chargeback to her bank, she may submit evidence, such as a cancellation letter, demonstrating she never received the goods or services for which she paid.  (Id. ¶ 105.)  When this occurs, the bank credits the customer, and the credit card processor reimburses the issuing bank for the amount of the disputed transaction. (Id.)  The processor then typically debits the merchant's account or, if sufficient funds are unavailable, it can seek reimbursement from the merchant.  (Id. ¶ 104.)

Plaintiff alleges that, because of requirements placed on it by VISA and MasterCard, it bears "full pecuniary responsibility for Northeast's incoming chargebacks to the card issuing banks, . . . notwithstanding the fact that Northeast

did not maintain sufficient reserves for Plaintiff to immediately recoup for itself the amount of the refunds." (Id. ¶ 69.) Put another way, the credit card processor allegedly must repay the bank for the chargeback, irrespective of whether the merchant holds up its own end of the bargain by reimbursing the processor.

C. The Alleged Scheme

Between June 2015 and January 2016, Elavon allegedly reimbursed issuing banks over $2.2 million—through chargebacks—for disputed transactions between cardholders and Northeast. (Id. ¶ 98.) Elavon claims that Northeast never repaid it the sum owed under the Contract and now owes it $1,933,645.22.[5] (Id. ¶ 48-49.) The SAC alleges that the credit card networks' rules—specifically, that the processor is responsible for paying the issuing bank in response to a chargeback, regardless of whether the merchant reimbursed the processor—were manipulated by defendants as part of a "wide-ranging fraudulent enterprise and conspiracy orchestrated" against it. (Id. ¶ 71.)

First, it alleges that Northeast never planned to provide goods or services to the customers whose credit cards it charged. (Id. ¶ 84.) To support this assertion, plaintiff claims that its representative visited the address which Northeast represented was its manufacturing facility location (the "Industrial Park") in the Contract. (Id. ¶ 72-73.) The representative allegedly learned that much of the Industrial Park—including Northeast's offices—had been destroyed by a fire in

---

[5] The claimed amount is allegedly "pursuant to the terms and conditions governing payment of chargebacks within the Contract at the time of Plaintiff's demand for payment." (SAC ¶ 48.)

2012, and that at the time the SAC was filed, Northeast's office was located "behind an unmarked door" in the "sole building . . . that remained undamaged."  (Id. ¶ 74-75.)  In addition, Northeast's name purportedly "does not appear anywhere in the Industrial Park," and there is no mailbox with Northeast's name on it even though other companies do have designated mailboxes at the Industrial Park.  (Id. ¶ 75-77.)  Furthermore, plaintiff asserts, Northeast's office is not "capable of producing the intricate metal work that it claimed to Plaintiff it produced," and it has no website or employees with experience in metal work.  (Id. ¶ 79-81.)

These allegations are intended as factual support for the assertion that all or most of the transactions which Elavon processed for Northeast were not "bona fide," in that the cardholders who engaged with Northeast "did not expect Northeast to provide them with any goods or services."  (Id. ¶ 84; see also id. ¶¶ 85-88.)  Rather, according to plaintiff, the Cardholder Defendants would charge their cards with Northeast, and once the issuing banks distributed funds to Northeast, it would deposit the "vast majority of those payments" into other accounts, including those belonging to D-Tech and JR.  (Id. ¶ 89-91.)  Then, according to Elavon, defendants Northeast, D-Tech, and JR "transferred moneys to the Cardholder Defendants" so that they could pay the debts incurred by the initial transactions.  (Id. ¶ 92-93.)  Plaintiff alleges that the Cardholder Defendants were motivated by the rewards they would receive from their issuing banks for the charges, as well as "other inducements."  (Id. ¶ 89.)

This alleged scheme, though, was only the precursor to the purported "chargeback scheme" that underlies much of plaintiff's claims. Starting in June 2015 and continuing through January 2016, Northeast allegedly initiated 369 chargebacks, amounting to over two million dollars. (Id. ¶ 98.) Allegedly, these chargebacks occurred because Northeast, D-Tech, JR, and/or one or more of the ABC Companies was "unwilling" or "unable" to satisfy the credit card debt owed by the Cardholder Defendants to their banks. (Id. ¶ 100.) As a result, Northeast issued letters ("Cancellation Letters") to the Cardholder Defendants canceling the transactions and recommending that the Cardholder Defendants forward the letters to their banks to assist with a chargeback, so that their credit card debt would thereby be diminished or eliminated. (Id. ¶¶ 100, 105.)

Finally, Elavon makes a number of assertions as to defendants' knowledge of and communication of the credit card companies' "rules and regulations" regarding chargeback procedures, including that they "agreed, colluded, and conspired together to defraud Plaintiff by utilizing the Processing Rules to their advantage." (Id. § 101.) They also claim that the Northeast Defendants "provided instruction to the Cardholder Defendants concerning various proper bases pursuant to the Processing Rules upon which to initiate chargebacks . . . to maximize the chances" that the issuing banks would validate the requests. (Id. ¶ 109.)

As factual support for its allegations in the SAC, plaintiff submitted four exhibits to the Court. Exhibit 1, the Contract, includes Merchant Application Northeast allegedly submitted to Elavon, as well as Elavon's Terms of Service,

which plaintiff claims are incorporated by reference.  The Contract appears to be signed by "E. Castillo" and "David Hirsch," a sales representative for Elavon. (Contract at 6.)  The Terms of Service require that merchants submit "bona fide" transactions only and that no transaction "involves the use of a Payment Device for any purpose other than the purchase of goods or services . . . .  No Transaction involves a Customer obtaining cash from Merchant unless allowed by the Payment Network Regulations and agreed to in writing with Elavon."  (Contract at 19.)  The Terms of Service also require that merchants are "fully liable to Elavon and [the relevant financial institution] for all transactions returned . . . for whatever reason including all Chargebacks."  (Contract at 14.)

Exhibit 2 is a list of credit card transactions between Northeast and certain of the Cardholder defendants.  (SAC, Ex. 2 ("Transaction List").)  The table below summarizes the number of chargebacks per defendant:

Table 1.

| Defendant | Number of Chargebacks |
|---|---|
| J. Friedman | 262 |
| R. Friedman | 38 |
| M. Kestenbaum | 14 |
| J. Friedlander | 0 |
| M. Weiss | 16 |
| H. Weiss | 7 |
| J. Rubin | 5 |
| D. Kaplan | 0 |
| J. Weider | 2 |
| H. Reichman | 5 |
| A. Lowy | 1 |
| Unknown/Doe | 7 |

Exhibit 3 collects thirty-nine Cancellation Letters from Northeast Defendants to Cardholder Defendants. (SAC, Ex. 3 ("Cancellation Letters").) It includes only letters to J. Friedman, R. Friedman, M. Kestenbaum, and H. Reichman, with the bulk of them addressed to the Friedmans.

Exhibit 4 collects letters that the Cardholder Defendants sent to their credit card issuing banks, though many of them are duplicates. (SAC, Ex. 4 ("Letters to Issuing Banks").) It includes only letters sent by the Friedmans.

Based on plaintiff's exhibits, two defendants—J. Friedman and R. Friedman—are on the transaction list, have cancellation letters included in Exhibit 3, and have letters included in Exhibit 4. Table 2 provides a summary.

Table 2.

| Defendant | Transaction List | Cancellation Letters | Letters to Issuing Banks |
|---|---|---|---|
| J. Friedman | X | X | X |
| R. Friedman | X | X | |
| M. Kestenbaum | X | X | |
| J. Friedlander | | | |
| M. Weiss | X | | |
| H. Weiss | X | | |
| J. Rubin | X | | |
| D. Kaplan | | | |
| J. Weider | X | | |
| H. Reichman | X | X | |
| A. Lowy | X | | |
| Unknown/Doe | X | | |

II.    PROCEDURAL HISTORY

Plaintiff originally filed this lawsuit on October 9, 2015. (ECF No. 1.) The initial complaint alleged breach of contract against Northeast, breach of guaranty against Castillo, and common law fraud, unjust enrichment, and recovery pursuant

to quantum meruit against Northeast, Castillo, John Does 1-50, and ABC Companies 1-50. (Compl. (ECF No. 6).) After those defendants sought to file a motion to dismiss, Judge Karas held a pre-motion conference on February 3, 2016 and ordered plaintiff to file an amended complaint. That Amended Complaint, filed on February 17, 2016, added J. Friedman and R. Friedman as defendants for the common law fraud, unjust enrichment, and recovery pursuant to quantum meruit claims. (Am. Compl. (ECF No. 16).) After briefing and oral argument, Judge Karas partially granted the Friedmans' subsequent motion to dismiss on November 30, 2016. (ECF No. 68.) That Order dismissed the fraud and quantum meruit claims without prejudice, denied the motion to dismiss with respect to the unjust enrichment claim, and permitted plaintiff to file a second amended complaint. (Id.)

The Second Amended Complaint—the subject of this motion—was filed on January 31, 2017. (See generally SAC.) The SAC added fifteen defendants, mostly as cardholders, as well as four RICO claims. (Id.) In response, defendants filed five separate motions to dismiss. (ECF Nos. 115, 118, 123, 125, 129.) This case was transferred to the undersigned on September 28, 2017.

III. LEGAL PRINCIPLES

A. Pleading Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must provide grounds upon which their claim rests through "factual

allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "'enough facts to state a claim to relief that is plausible on its face.'" Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In applying that standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. Furthermore, the Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir.2007) (citing Twombly, 550 U.S. at 555). If the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [Plaintiff's] claims across the line from conceivable to plausible"— dismissal is appropriate. Twombly, 550 U.S. at 570.

Additionally, when a plaintiff alleges fraud, the pleading standard is heightened. "Rule 9(b) requires that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b) (alteration in original)). The Second Circuit reads Rule 9(b) to "require that a

complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Id. (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)); see also L.S. v. Webloyalty.com, Inc., 673 F. App'x 100, 104 (2d Cir. 2016) (laying out the same standard); Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990) (requiring plaintiffs to "plead the factual basis which gives rise to a 'strong inference' of fraudulent intent" (quoting Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987)).

This heightened standard applies to RICO claims as well. See Lundy v. Catholic Health Sys., 711 F.3d 106, 119 (2d Cir. 2013) ("On a motion to dismiss a RICO claim, Plaintiffs' allegations must also satisfy the requirement that, '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" (quoting Fed. R. Civ. P. 9(b))); Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 655 (S.D.N.Y. 1996), aff'd, 113 F.3d 1229 (2d Cir. 1997) ("Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device. Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." (internal quotations omitted)).

B.  RICO Claims

RICO "sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate 'a[n] enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.'"  RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2097 (2016).

> These prohibitions can be summarized as follows.  Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise.  Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity.  Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity.  Finally, § 1962(d) makes it unlawful to conspire to violate any of the other three prohibitions.

Id.  "To establish a civil RICO claim, a plaintiff must allege '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.'"  Lundy v. Catholic Health Sys., 711 F.3d 106, 119 (2d Cir. 2013) (quoting Anatian v. Coutts Bank Ltd., 193 F.3d 85, 88 (2d Cir. 1999)).  Claims under 18 U.S.C. § 1962(a)-(c) all require that each of these elements be sufficiently alleged.  See RJR Nabisco, 136 S. Ct. at 2105 ("Each of RICO's substantive prohibitions requires proof of an enterprise that is 'engaged in, or the activities of which affect, interstate or foreign commerce.'" (citing 18 U.S.C. §§ 1962(a)-(c))); H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 232 (1989) ("Each prohibited activity is defined in 18 U.S.C. § 1962 to include, as one necessary

element, proof either of 'a pattern of racketeering activity' or of 'collection of an unlawful debt.'").[6]

      1. "An Enterprise"

      To determine whether an "enterprise" existed, courts look for "'a group of persons associated together for a common purpose of engaging in a course of conduct,' the existence of which is proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). The "enterprise" must be "distinct from the person conducting the affairs of the enterprise," but it need not be a formal legal entity. First Capital, 385 F.3d at 173 (citing Turkette, 452 U.S. at 583; Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161-62 (2001)). As the Supreme Court has explained,

> [s]uch a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies.

Boyle v. United States, 556 U.S. 938, 948 (2009). Rather, it may simply be a "discrete economic association existing separately from the racketeering activity."

---

[6] RICO provides for both civil as well as criminal penalties: "[s]ection 1964(c) allows '[a]ny person injured in his business or property by reason of a violation of section 1962' to sue for treble damages, costs, and attorney's fees." RJR Nabisco, 136 S. Ct. at 2106; see also Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 265 (1992) (reciting the language of § 1964).

First Capital, 385 F.3d at 173 (quoting United States v. Anderson, 626 F.2d 1358, 1372 (8th Cir. 1980)).

"[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946; see also D. Penguin Bros. Ltd. v City Nat'l Bank, 587 Fed. App'x 663, 668 (2d Cir. 2014) (describing the same elements). It may not be a "hub-and-spokes" association in which "several [spokes] each committed a similar but independent fraud with the aid of a particular [hub], and [] each such [spoke] acted on a particular occasion to benefit himself or herself and not to assist any other [spoke]." First Nationwide Bank v. Gelt Funding, Corp., 820 F. Supp. 89, 98 (S.D.N.Y. 1993). Put another way, as this Court has previously held, "[i]f each act of fraud is equally effective without the perpetration of any other act of fraud—even if perhaps effective to a far lesser or different magnitude—then there is no RICO enterprise. If each act of fraud is not effective without the other acts of fraud, then a RICO enterprise exists." United States v. Chavez, 944 F. Supp. 2d 260, 275 (S.D.N.Y. 2013).

So to survive a motion to dismiss, the allegations of an "enterprise" must be "more than the sum of the participants in a series of independent frauds." Cedar Swamp Holdings, Inc. v. Zaman, 487 F. Supp. 2d 444, 452 (S.D.N.Y. 2007). It is not enough to include a "laundry list of the individuals and entities that were connected . . . and somehow involved in . . . alleged schemes." Id.; see also Kochisarli v.

16

Tenoso, 02-cv-4320, 2006 WL 721509, at *7 (E.D.N.Y. March 21, 2006) (holding that no enterprise was alleged where "a reader is unable to conceive of how these individuals are connected, worked together, or had any type of common purpose that would support a RICO claim").

2. A "Pattern"

To allege a "pattern of racketeering activity," RICO requires two or more predicate acts that occurred within ten years of each other. 18 U.S.C. § 1961(5). The plaintiff must sufficiently allege that the two (or more) acts have "continuity plus relationship which combines to produce a pattern." H.J. Inc., 492 U.S. at 239 (emphasis in original). "Continuity" is a "temporal concept"—it is demonstrated by either a "closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." Id. at 241-42.

To demonstrate closed-end continuity, the plaintiff must sufficiently allege "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months . . . do not satisfy this requirement." Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (quoting H.J. Inc., 492 U.S. at 242). In the Second Circuit, at least two years of alleged conduct is typically required, although this is not a bright line rule. Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 184 (2d Cir. 2008)). The relevant time period is the "time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." Id. at 184.

On the other hand, a showing of open-ended continuity requires only that the plaintiff "show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." Cofacredit, 187 F.3d at 242 (citing H.J. Inc., 492 U.S. at 242-43).

Predicate acts are "related" when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J., Inc., 492 U.S. at 240. "Predicate crimes must be related both to each other ('horizontal relatedness') and to the enterprise as a whole ('vertical relatedness')." Duval v. Albano, 16-cv-7810, 2017 WL 3053157, at *6 (S.D.N.Y. 2017) (citing Reich v. Lopez, 858 F.3d 55, 60 (2d Cir. 2017)).

### 3. "Racketeering Activity"

RICO "defines 'racketeering activity' to encompass dozens of state and federal offenses, known in RICO parlance as predicates." RJR Nabisco, 136 S. Ct. at 2096. "These predicates include any act 'indictable' under specified federal statutes," including wire fraud, 18 U.S.C. § 1343, mail fraud, id. § 1341, and financial institution fraud, id. § 1344. Id. "A predicate offense implicates RICO when it is part of a 'pattern of racketeering activity'—a series of related predicates that together demonstrate the existence or threat of continued criminal activity." Id. at 2096-97.

Plaintiff here claims that wire fraud, mail fraud, and financial institution fraud are defendants' predicate crimes. "To state a mail and wire fraud claim under

RICO, a plaintiff must allege that the defendant made two predicate communications, via interstate commerce, that constitute a pattern of racketeering activity." Mills, 12 F.3d at 1176 (citing Sedima, S.P.L.R. v. Imrex Co., 473 U.S. 479, 495-96 (1985)); see also 18 U.S.C. §§ 1341, 1343; Lundy, 711 F.3d at 119 ("To prove a violation of the mail fraud statute, plaintiffs must establish the existence of a fraudulent scheme and a mailing in furtherance of the scheme."). Those allegations must "state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent," as well as "give rise to a strong inference that the defendant possessed fraudulent intent." Mills, 12 F.3d at 1176; see also Duval, 2017 WL 3053157, at *7.

To state a RICO claim for financial institution fraud, a plaintiff must additionally allege that a defendant "knowingly execute[d], or attempt[ed] to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344; see United States v. Harris, 79 F.3d 223, 231-32 (2d Cir. 1996); Duval, 2017 WL 3053157, at *7. Under § 1344, "a 'financial institution' is not a loose or colloquial term, but a term of precise definition that can lead to grave criminal consequences." United States v. Bouchard, 828 F.3d 116, 126 (2d Cir. 2016). 18 U.S.C. § 20 defines "financial

institution" as it is used in § 1344; the statute lists ten categories, none of which appears to encompass credit card processors.[7]

C. Common Law Fraud Claims

In order to prevail on a fraudulent misrepresentation claim,[8] a plaintiff must show that: "(1) the defendant made a false representation of a material fact; (2) with knowledge of its falsity; (3) with scienter, namely an intent to defraud the plaintiff; (4) and upon which plaintiff justifiably relief; (5) thereby causing damage to the plaintiff." Cofacredit, 187 F.3d at 239; see also Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 784 (2d Cir. 2003) ("To succeed on a theory of fraudulent misrepresentation under New York law, a plaintiff must show that the defendant made a false representation of a material fact to the plaintiff and that the plaintiff suffered injury as a result of justifiable reliance upon that fact."). Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred

---

[7] These categories include:
> (1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act); (2) a credit union with accounts insured by the National Credit Union Share Insurance Fund; (3) a Federal home loan bank or a member, as defined in section 2 of the Federal Home Loan Bank Act (12 U.S.C. 1422), of the Federal home loan bank system; (4) a System institution of the Farm Credit System, as defined in section 5.35(3) of the Farm Credit Act of 1971; (5) a small business investment company, as defined in section 103 of the Small Business Investment Act of 1958 (15 U.S.C. 662); (6) a depository institution holding company (as defined in section 3(w)(1) of the Federal Deposit Insurance Act; (7) a Federal Reserve bank or a member bank of the Federal Reserve System; (8) an organization operating under section 25 or section 25(a) of the Federal Reserve Act; (9) a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978); or (10) a mortgage lending business (as defined in section 27 of this title) or any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974.

18 U.S.C. § 20.

[8] The Court reads Count VII as an allegation of fraudulent misrepresentation, though plaintiff identifies only "fraud." (SAC ¶¶ 166-77.)

generally.  But because 'we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 290 (2d Cir. 2006) (quoting <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47, 52 (2d Cir. 1995)).

"It is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract." <u>EQT Infrastructure Ltd. v. Smith</u>, 861 F. Supp. 2d 220, 233 (S.D.N.Y. 2012) (citations omitted).  To maintain a separate claim for fraud that does not merge with a breach of contract claim, a plaintiff must "(1) demonstrate[] a legal duty separate from the duty to perform under the contract; (2) point[] to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seek[] special damages that are unrecoverable as contract damages." <u>Merrill Lynch & Co. v. Allegheny Energy, Inc.</u>, 500 F.3d 171, 183 (2d Cir. 2007) (citing <u>Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.</u>, 98 F.3d 13, 20 (2d Cir. 1996)).  "Where courts have found viable fraud claims based on fraudulent misrepresentation, the statements concerned matters separate and distinct from the subject matter of the contract." <u>MCI World Commc'ns, Inc. v. N. Am. Commc'ns Control, Inc.</u>, 98-cv-6818, 2003 WL 21279446, at *9 (S.D.N.Y. June 4, 2003).  Put another way, "[a] plaintiff sufficiently states a claim upon which relief may be granted only when it alleges fraud that is extraneous to the contract, rather than merely fraudulent non-performance of the

contract itself." Todi Exports v. Amrav Sportswear, Inc., No. 95-cv-6701, 1997 WL 61063, at *2 (S.D.N.Y. Feb.13, 1997) (citation omitted).

D. Unjust Enrichment Claims

Under New York law, an unjust enrichment claim requires plausible allegations (1) that the defendants were enriched or benefitted, (2) at plaintiff's expense, and (3) that equity and good conscience require restitution. Golden Pacific Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir. 2001); see also Bigio v. Coca-Cola Co., 675 F.3d 163, 176-77 (2d Cir. 2012); Paramount Film Distrib. Corp. v. New York, 30 N.Y.2d 415, 421 (1972). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (citing City of Syracuse v. R.A.C. Holding, Inc., 685 N.Y.S.2d 381, 381 (4th Dep't 1999)). Additionally, "a claim will not be supported if the connection between the parties is too attenuated," though privity is not required. Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d 1104, 1111 (N.Y. 2011).

And like common law fraud claims, unjust enrichment claims may merge with contract claims "whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield, Inc., 448 F.3d 573, 587 (2d Cir. 2006) (citing Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190 (N.Y. 1987)). In New York, "[t]he theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any

22

agreement." <u>Beth Israel</u>, 448 F.3d at 586 (quoting <u>Goldman v. Metropolitan Life Ins. Co.</u>, 841 N.E.2d 742, 746 (N.Y. 2005)).

    E. <u>Conspiracy Claims</u>

In New York, "a mere conspiracy to commit a [tort] is never of itself a cause of action." <u>Alexander & Alexander, Inc. v. Fritzen</u>, 503 N.E.2d 102, 102 (N.Y. 1986) (alteration in original); <u>see also</u> <u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 401 (2d Cir. 2006) ("New York does not recognize an independent tort of conspiracy."). If another tort is demonstrated, plaintiffs may make "allegations of conspiracy . . . only to connect the actions of separate defendants with an otherwise actionable tort." <u>Alexander & Alexander</u>, 503 N.E.2d at 103.

IV.    DISCUSSION

    A. <u>RICO Claims</u>

Counts III, IV, V, and VI in the SAC allege RICO violations under 18 U.S.C. § 1962(a)-(d). Plaintiff fails to state a plausible claim under any section of RICO, as numerous of the required elements—including a predicate crime, the existence of an enterprise, and a pattern of activity—lack factual assertions in support.

    1. <u>Enterprise</u>

The SAC does not plead factual content that defendants were involved in an "enterprise" as RICO defines that term. Plaintiff makes only a conclusory allegation that "each of the Defendants was aware of the identities of the other Defendants or was aware that there were multiple other similarly-situated participants in the above-described fraudulent enterprise." (SAC ¶ 118; <u>see also</u> <u>id.</u>

23

¶ 97.)  And to support Counts III, IV, V, and VI, plaintiff simply asserts that defendants are "enterprises" as defined by 18 U.S.C. § 1961(4).  (Id. ¶¶ 141, 146, 154, 164.)  But plaintiff provides no factual statements to support this contention.  In fact, there is nothing to suggest that many of the defendants have ever met or communicated with each other in any way.  Plaintiff alleges only that a series of transactions took place between Northeast and most of the Cardholder defendants, and then that once chargebacks were initiated for some—but not all—of the defendants, two of them sent letters to their issuing banks requesting a refund.  These allegations do not make plausible a "group of persons associated together for a common purpose," nor do they suggest the existence of "evidence of an ongoing organization . . . [or] a continuing unit."  First Capital Asset Mgmt., 385 F.3d at 173 (quoting Turkette, 452 U.S. at 583).

Certainly, the enterprise need not be a formal or legally-recognized entity; but more must be alleged than a "laundry list" of participants.  Cedar Swamp Holdings, 487 F. Supp. 2d at 452.  Much like in Cedar Swamp, the SAC here does not tell the Court how the various defendants are connected to each other.  The exhibits show only two defendants—both Friedmans—even completed the chain of actions required by the alleged chargeback scheme.  (See Table 2.)  There are no specific allegations as to the defendants' roles in the alleged scheme.[9]

At best, the SAC alleges a rimless "hub-and-spokes" structure in which each cardholder defendant committed a separate act of fraud with only Northeast—but

---

[9] And in fact, defendants Lowy and Kaplan are not even listed on the Transaction List.

this is not enough for a RICO enterprise. Without allegations that any alleged conspirator acted for the benefit of another conspirator, that any had relationships with one another, or that their actions were anything except "isolated and independent," an "enterprise" is not sufficiently plead. <u>Cedar Swamp</u>, 487 F. Supp. 2d at 451.

   2. <u>Pattern of Activity</u>

  Even if an enterprise had been sufficiently alleged, the SAC does not contain sufficient plausible allegations that there was the "pattern" of activity required for a RICO claim. A "pattern" requires continuity and a relationship. Plaintiffs plausibly allege neither.

  Because plaintiffs fail to sufficiently allege predicate crimes (see below), plaintiffs also fail to allege that those alleged crimes continued for the requisite amount of time. But even assuming that the crimes did occur, plaintiffs fail to provide factual statements suggesting that they occurred over a "substantial period of time." <u>Cofacredit</u>, 187 F.3d at 242. The alleged chargebacks took place between June 2015 and January 2016, (SAC ¶ 47.) Although the SAC alleges that a "pattern of racketeering activity" started in 2012, (SAC ¶ 139), there are no factual assertions of criminal activity regarding the time period leading up to 2015.[10] At most, plaintiff alleges six or seven months of predicate activity—this falls far short

---

[10] Plaintiff does allege that beginning in 2012 "and possibly earlier," the Cardholder Defendants "provided various credit cards to Northeast so that Northeast could charge amounts to them supposedly as consideration for Northeast's provision of goods and services in return." (SAC ¶ 85.) But this activity is not a predicate crime for RICO, and thus the extended time frame is excluded from the analysis.

of the Second Circuit's two-year rule of thumb. For this reason, closed-end continuity has not been alleged.

Open-ended continuity does not appear to be present, either. The chargebacks stopped in January 2016, according to both Exhibit 2 and the SAC. There is no allegation of a "threat of continuing criminal activity"—in fact, the SAC names a specific end-point (January 2016). (SAC ¶ 98; see also Transaction List.) As such, plaintiff has also failed to support its assertion that defendants engaged in an open-ended "pattern of racketeering activity" under RICO.

As discussed below, plaintiffs do not sufficiently allege that predicate acts took place—as such, the Court need not, and cannot, analyze whether the predicate acts are "related" to each other vertically and horizontally, as none seem to exist on the face of the SAC. Even assuming that the actions alleged are crimes, though, the Court notes that there is no allegation of relatedness between many of them. The Court need look only at Table 2—which, as a whole, alleges only the Friedmans submitted fraudulent letters to their issuing bank—to see that the majority of alleged actions (e.g., the various chargebacks on the Transaction List) does not appear to be related to the enterprise as a whole (vertical relatedness). And there is no allegation that the chargebacks were horizontally related, as there is no claim that the various Cardholder Defendants even knew of the others' existence.

3. Predicate Crimes

Plaintiff claims that wire fraud, 18 U.S.C. § 1343, mail fraud, id. § 1341, and financial institution fraud, id. § 1344, are defendants' predicate crimes for the RICO

claims. Even if plaintiff had made plausible claims that (1) an enterprise had (2) engaged in a pattern of activity, the SAC does not allege facts that state a predicate crime may have occurred.

i. <u>Wire and Mail Fraud</u>

Plaintiff fails to meet Rule 9(b)'s heightened pleading standard for claims of fraud. Elavon does not state with specificity the content and details of the fraudulent communications or explain <u>why</u> the allegedly fraudulent statements were fraudulent. <u>See</u> <u>Rombach</u>, 355 F.3d at 170.

In describing the content of the allegedly fraudulent communications, plaintiff claims that the Northeast Defendants "drafted numerous letters to various of the Cardholder Defendants purporting to agree to cancel their respective share of the Subject Transactions due to unspecified reasons." (SAC ¶ 105.) Leaving aside the fact that the letters submitted by plaintiff do, in fact, give a reason (i.e., "given our current financial status" (<u>see</u> Cancellation Letters)), this allegation, accepted as true, does not indicate or suggest that the letters contained fraudulent statements. Plaintiff claims that the letters were "intentional misrepresentations," and "intentionally concealed the fact that the Subject Transactions were, in fact, fraudulent." (SAC ¶ 107.) But this mere recitation of the law is not a factual allegation that suggests to this Court that fraud may have occurred. It is not enough to claim that defendants made "fraudulent statements" or had "fraudulent interactions." (<u>See, e.g.</u>, <u>id.</u> ¶¶ 97, 171.) Plaintiff must "explain <u>why</u> they were fraudulent." <u>Mills</u>, 12 F.3d at 1176 (emphasis added).

Plaintiff rests much of its case on the allegation that the "Subject Transactions . . . did not involve provisions of goods and/or services in exchange for payment." (SAC ¶ 107.) But on its own, this does not indicate that the transactions may have been fraudulent. See Mills, 12 F.3d at 1176. At most, this could amount to a claim of breach of contract, as the Contract allegedly requires that all transactions are "bona fide"—all transactions must involve the use of a Payment Device in order to purchase goods or services. But it does not rise to the level of a fraud allegation. See id. ("Contractual breach, in and of itself, does not bespeak fraud, and generally does not give rise to tort damages.").

Plaintiffs also claim that "the Northeast Defendants . . . provided instruction to the Cardholder Defendants concerning various proper bases pursuant to the Processing Rules upon which to initiate chargebacks, the purpose of which was to maximize the chances that the Cardholder Defendants' card issuing banks would find their chargeback requests valid and initiate the chargebacks of the Subject Transactions." (SAC ¶ 109.) But as with many of the SAC's allegations, plaintiffs fail to allege this with particularity—there is no allegation as to where and when these "instructions" were given or who was involved. The SAC purports to offer an "example," but the example itself is vague, alleging that "one or more of the Cardholder Defendants" initiated the chargebacks and told their banks that "they purportedly heard that Northeast was closing." (Id.)

Plaintiff also claims that the Cardholder Defendants committed wire and mail fraud through their letters to their issuing banks to initiate chargebacks. (Id.

¶ 111.) As an initial matter, this part of the SAC is quite misleading: plaintiff provided letters from <u>only</u> the Friedman defendants—no others. But the SAC's allegation that the "Cardholder Defendants misrepresented the basis for the initiation of the chargebacks and also intentionally concealed the fact that the Subject Transactions were, in fact, fraudulent" (<u>id.</u> ¶ 112) is conclusory—this is a legal conclusion that is unsupported by the SAC and its attachments.

As such, plaintiff has not stated a claim for wire or mail fraud, and there is thus not a sufficiently alleged predicate crime for its RICO claims.

### ii.   Financial Institution Fraud

Additionally, Elavon does not appear to be, on the face of the SAC, a "financial institution" within the meaning of the statute. Credit card processors do not fall into any of the ten categories listed in 18 U.S.C. § 20. Financial institution fraud, then, cannot be a predicate crime for plaintiff's RICO claims.[11]

### B.  Common Law Fraud

For much the same reasons that plaintiff has not sufficiently alleged a predicate crime for its RICO claims, plaintiff does not plausibly state a claim for fraud in Count VII. The Court analyzes this claim separately for (1) Cardholder Defendants, S. Brach, J. Brach, and Kohen, and (2) Northeast and Castillo. Though as an initial matter, the Court notes that, as explained above, the SAC does not state a plausible claim that any defendant made a false representation.

---

[11] Additionally, because plaintiff does not state a plausible claim under 18 U.S.C. § 1962(a)-(c), plaintiff's claim under § 1962(d) fails as well.

As to the Cardholder Defendants, S. Brach, J. Brach, and Kohen, plaintiff fails to allege scienter with specificity. The SAC alleges only that they "were aware of the Processing Rules, the mechanism by which the chargeback procedure operated, and the specific information they were required to convey for their chargeback request to be successful." (SAC ¶ 113.) This, plaintiff asserts, indicates that defendants "intended, knew or suspected that the credit card issuing banks would forward their written or spoken reasons for initiating a chargeback of their respective Subject Transactions to the Plaintiff, and that Plaintiff would rely upon them to its detriment." (Id.)

These allegations do not satisfy Rule 9(b). Plaintiff has not "alleged even one particular example of the conduct alleged," Negrete v. Citibank, N.A., 187 F. Supp. 3d 454, 463 (S.D.N.Y. 2016); generalized assertions do not create even a "minimal factual basis for their conclusory allegations of scienter." Chill v. General Electric Co., 101 F.3d 263, 267 (2d Cir. 1996) (quoting Cohen v. Koenig, 25 F.2d 1168, 1173 (2d Cir. 1994)). It is entirely consistent with legal conduct for these defendants to have "intended, [known] or suspected that the credit card issuing banks would forward their written or spoken reasons for initiating a chargeback of their respective Subject Transactions to the Plaintiff." (SAC ¶ 113.) That is how chargebacks work. Knowledge of the mechanics and regulations of credit card chargebacks alone cannot indicate scienter. Holding otherwise would mean that this Court could be accused of fraud if it initiated a chargeback because a merchant was unable to fulfill an order it placed.

As to Northeast and Castillo, plaintiff's claim for fraud also fails because it merges with its breach of contract and breach of guaranty claims. The SAC's factual assertions point only to the possibility that Northeast and Castillo breached the contract by allowing transactions that were not "bona fide." No allegation provides demonstrates a separate legal duty held by Northeast or Castillo, and plaintiff does not allege special damages that are unrecoverable as contract damages.

For these reasons too, then, plaintiff's claim of common law fraud fails as to all defendants.

C. <u>Unjust Enrichment</u>

Plaintiff likewise fails to state a claim for unjust enrichment in Count VIII. Again, the Court analyzes this claim separately for (1) Cardholder Defendants, S. Brach, J. Brach, and Kohen, and (2) Northeast and Castillo.

As to the Cardholder Defendants, S. Brach, J. Brach, and Kohen, an allegation that they "derived significant revenue from the fraudulent scheme," (SAC ¶ 179), does not satisfy the requirement that this occurred "<u>at the expense of</u> another," (<u>Kaye</u>, 202 F.3d at 616). The SAC also offers no facts that make a causal relationship between Elavon and Cardholder Defendants plausible, or that indicate those defendants benefitted from an alleged relationship. The only benefit that the Cardholder defendants allegedly received is "<u>inter alia</u>, the rewards offered by the credit card issuing banks, e.g., points, cash back, etc., which are typically conferred based on amounts charged, as well as other inducements." (<u>Id.</u> ¶ 89.) As for the

Northeast defendants, including S. Brach, J. Brach, and Kohen, plaintiff asserts—even more vaguely—that "Northeast intended to use the funds obtained through the sham credit card transactions for purposes as yet unknown, but could have included, for example, short term investments or purchase of inventory for other business endeavors." (Id. ¶ 88.) For neither group of defendants does Elavon offer specificity as to the actual benefit received; a reasonable guess is not enough.

Furthermore, there is no allegation that many of the defendants even knew of Elavon's existence, as they allegedly communicated only with Northeast and their issuing banks. Without an allegation that "would indicate a relationship between the parties, or at least an awareness by [defendant] of [plaintiff's] existence," a claim for unjust enrichment cannot stand—the parties are too attenuated. Mandarin Trading Ltd., 944 N.E.2d 1104, 1111 (N.Y. 2011); see also Georgia Malone & Co. v. Rieder, 973 N.E.2d 743, 747 (N.Y. 2012) (dismissing a complaint that did not "assert that [defendant] and [plaintiff] had any contact regarding the . . . transaction" in question).[12]

And as to Northeast and Castillo, Count VIII suffers from the same infirmity as Count VII. Count VIII—which is stated in just a few sentences thrown in toward the end of the SAC—fails to assert any claim that arises separately from the contract claims in Counts I and II and offers no allegations to separate the counts.

---

[12] Elavon does allege a direct relationship with Northeast and Castillo. (SAC § 41, 51.) But its claim for unjust enrichment against them still cannot stand because of the SAC's lack of specific allegations that Northeast and Castillo profited at Elavon's expense.

Elavon does not allege special damages, either. As such, Count VIII must also be dismissed.

V.    <u>Conspiracy</u>

As stated above, New York does not recognize a standalone claim for conspiracy. Because Counts III, IV, V, VI, VII, and VIII fail, and Counts I and II are claimed against one defendant each, plaintiff's claim for conspiracy—Count IX—cannot withstand the motion to dismiss.

VI.   CONCLUSION

For the foregoing reasons, Counts III, IV, V, VI, VII, VIII, and IX are hereby DISMISSED in their entirety, with prejudice.[13]  As such, all defendants other than Northeast and Castillo are TERMINATED as parties to this action.  The Clerk of Court is directed to close the motions at ECF Nos. 114, 118, 119, 123, 125, and 129. A separate scheduling order will issue.

SO ORDERED.

Dated:     New York, New York
           October 27, 2017

_____
KATHERINE B. FORREST
United States District Judge

---

[13] Plaintiffs seek leave to amend.  While "[c]omplaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend," <u>Luce v. Edelstein</u>, 802 F.2d 49, 56 (2d Cir. 1986) (citing 2A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 9.03 at 9-34 (2d ed. 1986)), the Court need not grant that leave when plaintiffs are on their <u>third</u> pleading attempt.  <u>Luce</u>, 802 F.2d at 56 (citing <u>Armstrong v. McAlpin</u>, 699 F.2d 79, 93-94 (2d Cir. 1983); <u>Decker v. Massey-Ferguson, Ltd.</u>, 681 F.2d 111, 115 (2d Cir. 1982); <u>Denny v. Barber</u>, 576 F.2d 465, 470-71 (2d Cir. 1978)).