UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELAVON, INC.,

Plaintiff,

- *against* -

NORTHEAST ADVANCE TECHNOLOGIES, INC.,
SAMUEL BRACH, JOSHUA BRACH, ESTEBAN
CASTILLO, JOEL FRIEDMAN, AND RIVKY
FRIEDMAN,

Defendants.

15 Civ. 7985 (KMK)(PED)

**MEMORANDUM
AND ORDER**

**PAUL E. DAVISON, U.S.M.J.:**

This Memorandum and Order addresses three separate motions for discovery sanctions.

Defendants Joel and Rivky Friedman (the "Friedman Defendants"), as well as Defendants

Northeast Advance Technologies, Inc., Samuel Brach, Joshua Brach, and Esteban Castillo (the

"Northeast Defendants" and together with the Friedman Defendants, the "Defendants") seek

discovery sanctions against Plaintiff Elavon, Inc. ("Plaintiff" or "Elavon") for failing to suspend

its 90-day retention policy and for failing to timely produce an audio recording. Elavon seeks

sanctions against the Northeast Defendants for the spoliation of emails for sbrach@gmail.com

and EzEtch@gmail.com prior to January 1, 2018. Elavon also seeks spoliation sanctions against

the Friedman Defendants for failing to preserve evidence during the time they were no longer a

party to this action. All of the motions have been fully briefed. Familiarity with the record is

assumed.

For the reasons stated below, the motions filed by the Friedman Defendants and the

Northeast Defendants are **DENIED**, and Elavon's motion is **GRANTED IN PART** and

**DENIED IN PART**.

## I. APPLICABLE LAW

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 148 (2d Cir. 2008) (internal quotation marks omitted). The moving party bears the burden of proving the elements of a spoliation claim. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). These elements are: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012) (quoting *Residential Funding*, 306 F.3d at 107). If the moving party can satisfy these elements, then the "court may, in its discretion, grant an adverse inference jury instruction or other sanctions insofar as such a sanction would serve the threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation." *Id.* (internal quotations omitted). An adverse inference jury instruction is "an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (*Zubulake IV*). "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge

and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001) (internal citation omitted).

## II. ANALYSIS

### A.    Defendants' Motions for Discovery Sanctions

All Defendants seek spoliation sanctions against Elavon because Elavon failed to suspend its 90-day retention policy for its emails. [Dkts. 502, 503.] Defendants also move for sanctions because Elavon failed to timely produce an audio recording. Elavon opposes. [Dkt. 508.] Defendants have filed replies. [Dkts. 519, 520.]

#### 1.    Elavon's Emails

In connection with this ongoing litigation, Defendants deposed individuals that work for Elavon and investigated the chargeback scheme. These included Ms. Holly Franklin and Mr. Christopher Smith. Ms. Franklin is Elavon's 30(b)(6) witness and was a Senior Director of risk assessment management during the relevant period. She is currently Elavon's Vice President of risk assessment. Mr. Smith was Elavon's Vice President of risk assessment during the relevant period, and is currently Elavon's Vice President of pricing for North America.

In her deposition, Ms. Franklin testified concerning Elavon's email policy and the steps that Elavon took to preserve documents in this litigation. More specifically, she noted that Elavon had a 90-day retention policy and that after the 90 days, emails would automatically be deleted. She further noted that she did not know if anybody was instructed to suspend the 90-day retention policy. She also noted that she did not know if anyone had implemented a formal legal

record hold in this case, but noted that she believed that the normal retention policy was still in place. [Dkt. 502-2 at 24-25.][1]

Ms. Franklin also described how she would communicate with her colleagues around the time that Elavon became suspicious of Defendants' activities. She noted that around that time, she would regularly communicate with her colleagues via email. She also noted that she and Mr. Smith were the primary contacts for the case and that they typically communicated in person because they worked in offices that were side by side. She further stated that she did not recall any specific emails but that there were definitely emails sent that were related to the case. Finally, Ms. Franklin noted that she probably sent updates regarding the case to Tim Miller, the individual that she reported to, via email. [Dkt. 502-2 at 78-81.]

Similar to Ms. Franklin, Mr. Smith was also deposed and questioned regarding Elavon's email retention policy and the steps he took to preserve evidence. Mr. Smith stated that he forwarded all relevant emails to counsel, but that there would have been very few emails, if any. He further noted that most of the communications for the case were either in person or phone calls. With respect to Elavon's email retention policy, he stated that emails from that time would no longer be in existence because of Elavon's 90-day purge policy and that he believed it was a true purge, whereby the emails could no longer be retrieved. [Dkt. 502-5 at 39-41.]

During his deposition, Mr. Smith also described when he and Ms. Franklin first identified potential issues with the chargebacks made by Northeast Advance Technologies, Inc. ("Northeast"). More specifically, he described how some time in the summer of 2015, Ms.

---

[1] The deposition testimony is not in the record because it is subject to a protective order, but the transcripts for the relevant depositions were provided to, and reviewed by, the Court.

Franklin came into his office and asked him to review an account with her. He stated that this meeting with Ms. Franklin would not have generated any notes or any other recorded information. He further stated that it was common for the two of them to have in person discussions because their offices were seven feet apart. He noted that the account raised enough concern that he called Eric Woods, the manager or director of the Elavon's loss prevention team. [Dkt. 502-5 at 23-27.]

In order to succeed on their motions, Defendants must first demonstrate that Elavon had an obligation to preserve its emails. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujits Ltd.*, 247 F.3d at 436. Thus, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake IV*, 220 F.R.D. at 218. This obligation extends to individuals that are "key players in the case" who are "likely to have discoverable information that the disclosing party may use to support its claims or defenses." *Id.* "Key players" are further defined as "the people identified in a party's initial disclosure and any subsequent supplementation thereto." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 433-34 (S.D.N.Y. 2004) (*Zubulake V*).

Here, although the exact date when Elavon realized it would need to initiate litigation is unknown, Elavon should have issued a litigation hold when it filed the instant action at the latest. *See Zubulake IV*, 220 F.R.D. at 218. In his deposition, Mr. Smith noted that he and Ms. Franklin first noticed the issues with the chargebacks in summer of 2015. The instant action was filed by October of that year. If Elavon at the very least issued a hold when there was no doubt regarding

its duty to preserve—i.e., when Elavon filed the instant action—it would have suspended

Elavon's 90-day retention policy and could have preserved the emails that were sent over the

summer of 2015.   However, instead of implementing a litigation hold, Elavon allowed its

automatic deletion policy to run its course unabated, which lead to the destruction of its emails.

Further, Elavon does not dispute that Ms. Franklin and Mr. Smith are key players in this

litigation.  [Dkt. 508 at 8.]  In light of their status as key players, Elavon was under an obligation

to preserve the emails from Ms. Franklin's and Mr. Smith's accounts but seemingly failed to do

so.

        In addition to spoliation sanctions for Ms. Franklin's and Mr. Smith's accounts , it seems

that the Friedman Defendants also seek spoliation sanctions for emails from Vadeen Sisk's and

Brian Boyden's accounts, as they argue that these individuals were key players as well.  [Dkt.

502-8 at 6-7, 12-13.][2]  Ms. Sisk is currently the Vice President of Elavon's global chargeback

team, but was a Vice President of loss prevention around the time that Ms. Franklin and Mr.

Smith first noticed the chargeback issues.  [Dkt. 494-7 at 13-14.]  During her deposition, Ms.

Sisk stated that she did not really have any interaction with the chargeback team while on the loss

prevention team.  [*Id.* at 36.]   She further stated that she was not aware of any other Elavon

employees (besides Ms. Franklin and Mr. Smith) who would have any knowledge of this case.

[Dkt. 509-1 at 140.]  Given Ms. Sisk's testimony, she was not a "key player" in this case as she

was not "likely to have discoverable information." *Zubulake IV*, 220 F.R.D. at 218.

---

[2] In their reply, the Friedman Defendants appear to argue that April Sutherland is a key individual, but then acknowledge that she "might not have been a 'key employee' in this case." [Dkt. 520-4 at 11.]  The Court declines to address this argument. *See Go v. Rockefeller Univ.*, 280 F.R.D. 165, 171 (S.D.N.Y. 2012).

Mr. Boyden is a senior manager in the dispute department and held that position during the relevant time period. [Dkt. 502-7 at 8.] Mr. Boyden's role at Elavon consisted of processing the chargebacks. In his deposition, he stated that he did not recall if Ms. Franklin or Mr. Smith ever reached out to him to discuss how to handle a particular merchant or a particular chargeback in connection with Northeast. [Dkt. 502-7 at 26.] He further stated that he did not recall if he received emails or phone calls from either Ms. Franklin or Mr. Smith in connection with Northeast. [*Id.*] Mr. Boyden also stated that he did not recall any meetings with Ms. Franklin or Mr. Smith about Northeast. [*Id.* at 27.] In light of Mr. Boyden's limited interaction with Ms. Franklin and Mr. Smith concerning this case, he was not a key player who would have "discoverable information." *Zubulake IV*, 220 F.R.D. at 218.

Given that Ms. Franklin and Mr. Smith were key players, the Defendants proceed to the next step for those two individuals. To satisfy the next step, the Defendants must demonstrate that Elavon destroyed Ms. Franklin's and Mr. Smith's emails with a culpable state of mind. "[T]he culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." *Residential Funding*, 306 F.3d at 108 (internal quotation marks and alterations removed). When a party negligently destroys evidence, the level of negligence considered is typically gross negligence but can also include ordinary negligence. *Id.* at 113.

The failure to implement a litigation hold does not constitute *per se* gross negligence, but rather is one factor "in the determination of whether discovery sanctions should issue." *Chin*, 685 F.3d at 162. Nonetheless, a "company's failure to institute any of the widely-recognized steps to preserve data is an important consideration for a court when evaluating culpability." *Hawley v.*

*Mphasis Corp.*, 302 F.R.D. 37, 49 (S.D.N.Y. 2014) (internal quotations omitted).  Here, Elavon does not dispute that it failed to implement a litigation hold.  Instead it argues that "[t]here is no indication in the motion record that Elavon can suspend its document retention policy limited to specific individuals or devices." [Dkt. 508 at 18.]  However, Elavon does not present evidence to the contrary—i.e. that it cannot suspend its retention policy—to explain why it failed to engage in the "widely-recognized step" of instituting a litigation hold.  *See Hawley*, 302 F.R.D. at 49. Further, Elavon is the plaintiff in this matter and it should have known that emails exchanged between its two key players, or even between those key players and other employees, were going to be the subject of this litigation.  *See Sekisui American Corp. v. Hart*, 945 F. Supp. 494, 507 (S.D.N.Y. 2013) (finding gross negligence where a plaintiff failed to implement a *timely* litigation hold).  Given that Elavon never issued a litigation hold for its two key players,  Elavon acted with gross negligence when it permitted the destruction of the emails from Ms. Franklin's and Mr. Smith's account.

    For the final step, the Defendants must show that the evidence was "relevant to a party's claim or defense."  *Chin*, 685 F.3d at 162.  Relevance "means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence."  *Residential Funding*, 306 F.3d at 108–09.  "[T]he  concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant."  *Zubulake V*, 229 F.R.D. at 431.  Where there is a finding of gross negligence, Courts sometimes find that there is a presumption that the destroyed evidence would have been "unfavorable to the grossly negligent party."  *Residential Funding*, 306 F.3d at 109.  "The conduct, however, must be egregious."  *Orbit One Commcs., Inc. v. Numerex Corp.*, 271 F.R.D. 429, 439 (S.D.N.Y. 2010).

"In the absence of bad faith or other sufficiently egregious conduct, it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." *Id.* (internal quotation marks omitted). Here, I find that Elavon's passive failure to suspend its 90-day retention policy was not so egregious that it merits a presumption of assistive relevance. *See Hawley*, 302 F.R.D. at 49 (declining to find a presumption of assistive relevance where the contents of a laptop were erased as part of the company's procedure). Thus, in order to prevail, Defendants must provide extrinsic evidence to support a finding that the destroyed evidence would be favorable to them or unfavorable to Elavon. *Residential Funding*, 306 F.3d at 108-09. Nonetheless, "[c]ourts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence, because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from that destruction." *Id.* at 109 (alterations and internal quotations omitted).

In order to meet this final step, Defendants rely primarily on Ms. Franklin's and Mr. Smith's depositions. In his deposition, Mr. Smith described how the communications related to identifying the issues with the Northeast chargebacks were in person. [Dkt. 502-5 at 23-27.] When discussing the type of communication that was used in this case, Mr. Smith stated that there would have been a limited number of emails, if any, and that most of the communications in this case were either in person or over the phone. [*Id.* at 40.] He also stated that he communicated status updates to his supervisor, Mr. Miller, by walking to his office, which was approximately 20 feet away from his own office, or giving him a call. [*Id.* at 58, 62.] Given that Mr. Smith's testimony provides that his communications related to this case were almost entirely

in person or over the phone, Defendants fail to show that these emails, if any, were indeed relevant to their claim, let alone whether they would have been favorable to Defendants.

Ms. Franklin's testimony presents a different scenario, but nonetheless reaches a similar conclusion. She stated that during the relevant time period, she regularly communicated with her colleagues via email. [Dkt. 502-2 at 78.] She further stated that there were definitely emails between her and Mr. Smith. [*Id.* at 80.] Finally, Ms. Franklin noted that she probably sent updates on the status of the Northeast investigation to Mr. Miller via email. [*Id.* at 81.] Thus, her emails are indeed relevant to this case. However, Defendants again fail to argue, let alone show, that her emails would have been favorable to Defendants or unfavorable to Elavon. Instead, the Northeast Defendants summarily assert that the existence of the 90-day retention policy, and Elavon's failure to suspend it, is sufficient to merit sanctions (it is not). [Dkt. 503-1.] The Friedman Defendants argue that "Elavon's failure to suspend its auto-deletion policy led directly to the destruction of untold troves of emails, to the Friedmans' irreparable harm." [Dkt. 502-8 at 17.] Despite this conclusory assertion, the Friedman Defendants fail to show *how* they were irreparably harmed and instead simply demand an adverse inference and monetary sanctions. Given that the Defendants have failed to show that the spoliated evidence would have been favorable to them or unfavorable to Elavon, the Defendants fail to satisfy their burden. Accordingly, I decline to impose sanctions concerning Elavon's email retention policy.

### 2.    Elavon's Audio Recordings

Elavon has audio recordings of telephone calls related to the chargebacks at issue here. On October 26, 2021, during the deposition of Bernard Klein, a principal at Transmedia Payment Services, Ltd. ("Transmedia"), Elavon questioned Mr. Klein regarding a recording. [Dkt. 503-7

at 3.] Elavon had previously sent an email to the Northeast Defendants' counsel attaching certain recordings on March 15, 2019. [Dkt. 509-a at 159.] Elavon also sent recordings to the Northeast Defendants' counsel and the Friedman Defendants' counsel by email on October 26, 2021, after the deposition of Mr. Klein. [Dkt. 520-3 at 2.]

Defendants both argue that Elavon did not produce certain recordings before the deposition of Mr. Klein, and should be sanctioned for failing to timely produce those recordings. Elavon claims that it in fact previously produced these recordings via its March 15, 2019 email. "When the nature of the breach of discovery obligations is non-production of evidence, as opposed to actual destruction or significant alteration, a district court has broad discretion in fashioning an appropriate sanction." *In re Pfizer Sec. Litig.*, 288 F.R.D. 297, 325 (S.D.N.Y. 2013) (internal quotation marks and alterations omitted). To prevail on a motion for sanctions for an untimely production, the moving party must establish "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding*, 306 F.3d at 107.

Given that the recordings are related to the chargebacks, Elavon was under an obligation to produce them in a timely manner. Elavon claims that it produced these recordings via email to counsel on March 15, 2019, but the Friedman Defendants claim that Elavon produced the recordings by email on October 26, 2021, after the deposition of Mr. Klein. It is unclear whether the recordings produced on October 26, 2021 are the same recordings as those produced on March 15, 2019, or if they are additional recordings. Regardless, "[t]he ultimate production of

11

these documents militates against the imposition of sanctions." *In re Pfizer*, 288 F.R.D. at 325. Further, Defendants fail to even argue that Elavon had a culpable state of mind in the purportedly untimely production of these recordings. Accordingly, I deny Defendants' motions for sanctions on the grounds of the untimely production of the audio recordings.

**B.    Elavon's Motions for Spoliation Sanctions**

**1.    The Northeast Defendants' Emails**

Elavon has moved for spoliation sanctions against the Northeast Defendants due to the destruction of emails from before January 1, 2018 for the addresses of sbrach@gmail.com and EzEtch@gmail.com. [Dkt. 504.] The Northeast Defendants opposed. [Dkt. 510.] Elavon filed a reply. [Dkt. 522.]

On September 15, 2016, Elavon moved for a conference pursuant to Local Rule 37.2, requesting intervention regarding the Northeast Defendants' objections to Elavon's requests for production. [Dkt. 61 at 1.] Included in Elavon's requests for production was a request for "[a]ll documents that constitute or concern communications between Northeast and any other person concerning the subject matter of this litigation." [Dkt. 506-1 at 7.] The Northeast Defendants submitted a letter in opposition and stated that "[m]any of the documents requested are simply a matter of fact that Defendants are not in possession of documentation responsive to the demands[.]" [Dkt. 65 at 1.] This Court convened a conference on October 5, 2016 to address these issues. At that conference, the Northeast Defendants represented that they did not have any documents responsive to Plaintiffs' request. In light of that representation, this Court instructed the Northeast Defendants to provide an affidavit from Defendant Esteban Castillo—identified as the president of Northeast—regarding the documents that he allegedly could not find. In an

affidavit dated October 11, 2016, Defendant Castillo stated that "[n]either Northeast Advance Technology nor myself have further documentation responsive to these demands." [Dkt. 506-1 at 24.]

Notwithstanding this affidavit, Defendant Castillo later stated in a deposition that he did not have access to documents that would be responsive to Elavon's demands:

| | |
|---|---|
| Q: | Did you ever have access to any of Northeast's financial records? |
| CASTILLO: | No, sir. |
| Q: | Did you ever have any access to any documents on behalf of Northeast? |
| CASTILLO: | No, sir. |
| MR. LANDRIGAN: | Any documents of any kind? |
| Q: | Any documents of any kind. |
| CASTILLO: | No, sir. |

[*Id.* at 27.] In light of this admission, Defendant Castillo was further questioned regarding the affidavit he submitted on behalf of the Northeast Defendants:

| | |
|---|---|
| Q: | If you didn't have access to Northeast's financial information, how could you make these statements? |
| CASTILLO: | That's a good question. |
| Q: | Do you have anything else to say? |
| CASTILLO: | No, sir. |
| Q: | Did you prepare this document? |
| CASTILLO: | No. |
| Q: | Do you know who prepared it? |
| CASTILLO: | My lawyer. |

[*Id.* at 31.]

On October 13, 2021, Elavon filed a letter with this Court, describing how it had recently received an email production from a non-party, Transmedia, that included communications with the email address sbrach@gmail.com, the email address presumably associated with Northeast's owner, Samuel Brach. [Dkt. 472 at 2.] The Northeast Defendants responded to Elavon's letter on October 26, 2021, and stated that after a further search for emails, "we were informed by our client that there are no emails available as to the email accounts of sbrach@gmail.com or for EzEtch@gmail.com . . . for any dates prior to January 1, 2018, due to data limits on gmail.com accounts." [Dkt. 478 at 1.] Shortly thereafter, the Northeast Defendants engaged Systech to see if they could retrieve the lost emails. [Dkt. 510-5 at 2.] On October 29, 2021, Systech notified the Northeast Defendants that they could not retrieve the emails. [*Id.*] On November 1, 2021, the Northeast Defendants also reached out to Google support to see if they could recover the emails, but Google was unable to retrieve them. [Dkt. 510-4 at 2-4.]

Elavon seeks spoliation sanctions against the Northeast Defendants for the loss of emails for sbrach@gmail.com and EzEtch@gmail.com prior to January 1, 2018. In order to prevail, Elavon must first show that the Northeast Defendants had a duty to preserve the emails associated with those addresses. *Fujits Ltd.*, 247 F.3d at 436.

Elavon argues that the Northeast Defendants had a duty to preserve the emails for both sbrach@gmail.com and EzEtch@gmail.com. The Northeast Defendants seem to argue that they were under no obligation to preserve the emails for either account because they were not under the "control" of the Northeast Defendants. [Dkt.510 at 2.] In his deposition, Defendant Joshua Brach testified that the EzEtch@gmail.com address was the "office administrative e-mail overall

14

to send and receive anything related to the business." [Dkt. 510-2 at 3.] When asked who had access to the account, he stated,

> I don't know. I don't remember who had access to it. I had access to it obviously.
> It was open in the office. Possibly my father. I'm not sure if somebody else in the
> shop, if they had the e-mail open to send back and forth, you know, work orders,
> something like that. But it was kind of a general there. But I'm not sure a hundred
> percent; I don't remember.

[*Id.* at 3-4.] Although the email account may have been accessed by multiple individuals, because Defendant Joshua Brach had access to the EzEtch@gmail.com account, and thus would have been able to obtain and preserve the emails, Defendant Joshua Brach indeed had control over the account. *See In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) ("Under Rule 34, control does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." (internal quotations omitted)). The email account for sbrach@gmail.com presents a different issue as the Northeast Defendants simply argued that "Joshua never had access to the sbrach@gmail.com account." [Dkt. 510 at 3.] That may very well be, but Elavon argues that the account belonged to Defendant Joshua Brach's father, Defendant Samuel Brach, and the Northeast Defendants do not dispute this. Given that Defendant Samuel Brach is a named defendant to this action, he was a key player and under an obligation to preserve the emails from that account. *Zubulake V*, 229 F.R.D. at 433-34.

Elavon must next show that the Northeast Defendants acted with a culpable state of mind when they failed to preserve the emails associated with sbrach@gmail.com and EzEtch@gmail.com. Elavon argues that the Northeast Defendants acted with intentional bad

faith because the affidavit submitted by Defendant Castillo falsely asserted that they had produced all documents responsive to Elavon's request, when in fact they had not, and their false assertion lead to a delay that allowed the emails to be deleted from the accounts due to size limitations. I agree. The Northeast Defendants intentionally mislead Elavon, and this Court, by representing that the Northeast Defendants did not have any documents responsive to Elavon's request for documents, when in fact they had these emails. Had the Northeast Defendants actually gathered the responsive emails for sbrach@gmail.com and EzEtch@gmail.com at the time they were requested, then the emails would have been produced and Google's data limitations would not have come into play. Accordingly, the Northeast Defendants' actions merit a finding of intentional bad faith. *See Novick v. Axa Network, LLC*, 2014 WL 5364100, at *6-7 (S.D.N.Y. Oct. 22, 2014).

"Relevance and prejudice may be presumed when the spoliating party acted in bad faith[.]" *Ottoson v. SMBC Leasing and Finance, Inc.*, 268 F.Supp.3d 570, 581 (S.D.N.Y. 2017). Given that the Northeast Defendants' actions rise to the level of intentional bad faith, Elavon is entitled to a presumption of assistive relevance. The Northeast Defendants may rebut this presumption by "demonstrating that the innocent party had access to the evidence alleged to have been destroyed or that the evidence would not support the innocent party's claims or defenses." *Hawley*, 302 F.R.D. at 48. The Northeast Defendants argue that because Elavon has emails between Transmedia and the two accounts, Elavon can "make use of them at trial" and does not face any prejudice. [Dkt. 510 at 5.] I disagree. Elavon is prejudiced because *all* of the emails for the sbrach@gmail.com and EzEtch@gmail.com accounts prior to January 1, 2018 were deleted and there is no way to know what additional responsive emails may have been in those

16

accounts. Thus, the Northeast Defendants' argument is unavailing and insufficient to overcome the presumption. Accordingly, I grant Elavon's motion for sanctions with respect to the Northeast Defendants.

### 2.    The Friedman Defendants' Evidence

Elavon also seeks spoliation sanctions against the Friedman Defendants for failing to preserve any evidence after it was dismissed from the action. [Dkt. 504.] The Friedman Defendants opposed. [Dkt. 507.] Elavon filed a reply. [Dkt. 522.]

The Friedman Defendants were first introduced to this action through Elavon's Amended Complaint, filed on February 17, 2016. [Dkt. 16.] The Friedman Defendants then moved for dismissal and by order dated October 27, 2017, they were dismissed from this action. [Dkt. 159.] On November 26, 2017, Elavon moved for a certificate of appealability, but it was denied on December 19, 2017. [Dkts. 166, 180.] On April 12, 2019, Elavon moved to file its Third Amended Complaint that would reinstate some of the original claims against the Friedman Defendants. [Dkt. 254.] By order dated November 21, 2019, Elavon was allowed to amend its complaint and the Friedman Defendants became defendants in this action once again. [Dkt. 291.]

Meanwhile, in and around late 2018, the Friedman Defendants closed their business and ceased using their business email and domain platforms. [Dkt. 507-1 at 2-3.] Joel Friedman asserts that he "reached out to a point person that used to manage the emails and domains and asked him if he would be able to recover any emails or access the domain platforms. He told me that he could not." [*Id.* at 2.] At this time, the Friedman Defendants' business is "largely shuttered." [*Id.*]

17

Elavon seeks spoliation sanctions against the Friedman Defendants for the loss of evidence after the Friemdan Defendants were dismissed from the case. In order to prevail, Elavon must first show that the Friedman Defendants had a duty to preserve the evidence. *Fujits Ltd.*, 247 F.3d at 436. A party has the duty to preserve, when it "has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Id.* Thus, the question here turns on whether the Friedman Defendants should have known that there was a potential for future litigation.

Elavon argues that the Friedman Defendants had a duty to continue to preserve the evidence because Elavon had moved to file an interlocutory appeal for their dismissal from the action. The Friedman Defendants argue that once the Court denied Elavon's certificate to appeal, they no longer had a duty to preserve. I disagree. Although the Court denied Elavon's certificate to appeal, Elavon would have been well within its right to appeal the Court's decision upon the completion of the litigation against the remaining parties. *See* Fed. R. Civ. P. 54(b). Because of the prospect that Elavon could reinstate its claims against the Friedman Defendants, the Friedman Defendants were on notice that the evidence within their possession would be relevant and thus they were under an obligation to preserve that evidence. *See Fujits Ltd.*, 247 F.3d at 436. Elavon has thus satisfied the first element.

To satisfy the next element, Elavon must show that the Friedman Defendants acted with a culpable state of mind. Elavon argues that the Friedman Defendants' actions were intentional, or at a bare minimum, grossly negligent. The Friedman Defendants argue that because they were unsophisticated litigants of limited means, they were merely negligent. In his deposition, Defendant Joel Friedman stated that he did not recall if he received any specific advice from his

counsel on his duty to preserve at the beginning of the litigation. [Dkt. 506-2 at 31.] He further

stated that in 2016, he did "[n]othing specific" to preserve any documents. [*Id.* at 32.] When

asked if he or his counsel at any time reviewed his emails to determine what he should "prevent

from being deleted", Defendant Joel Friedman stated: "No." [*Id.*] In an affidavit he submitted in

opposition to Elavon's motion for spoliation sanctions, Defendant Joel Friedman stated:

> I specifically recall that when my first attorney Brian K. Condon, Esq., was
> retained in or around March of 2016, one of very first requests to me was to
> provide him copies of communications with Brach/Northeast as well as copies of
> the dispute documentation used for the chargebacks. I remember searching but I
> did not locate any communications with Northeast or Brach. I also did not find
> chargeback documents. I recall locating some other documents related to this
> matter, such as a few communications with some banks and a few with
> Transmedia. I saved those in case my attorney found some use for them. Those
> have also been produced to my current counsel, and I believe provided to Elavon.

[Dkt. 507-1 at 2.] As discussed above, the Friedman Defendants have since closed their business

and no longer have access to the domain. The Friedman Defendants' conduct does not amount to

intentional bad faith, as Elavon has not demonstrated that the Friedman Defendants acted

intentionally or willfully in closing their business and terminating their domain. *See Passlogix,*

*Inc. v. 2FA Technology, LLC*, 708 F. Supp. 2d 378, 411 (S.D.N.Y. 2010) ("To have a sufficiently

culpable state of mind warranting a relevance inference, the spoliator must have acted in bad

faith—that is, intentionally or willfully."). Nonetheless, given that Defendant Joel Friedman's

affidavit seems to directly contradict his testimony, this Court is skeptical as to whether he and

his counsel actually took any steps to preserve any documents. *Compare* Dkt. 506-2 at 31-32

*with* Dkt. 507-1 at 2. Further, as discussed above, the Friedman Defendants' duty extended

beyond their dismissal because being called back in to this actual litigation was foreseeable. As a

result, the Friedman Defendants had an ongoing obligation and should have taken steps to

19

preserve and save documents relevant to this litigation. *Zubulake V*, 229 F.R.D. at 433 & n.79. Accordingly, the Friedman Defendants' failure to preserve the evidence was grossly negligent.

For the final element, Elavon must show that the evidence was relevant to a party's claim or defense. Where there is a finding of gross negligence, that finding alone can "support a finding that the evidence was unfavorable to the grossly negligent party." *Residential Funding*, 306 F.3d at 109. Although the Friedman Defendants were grossly negligent, their actions were not so egregious to merit the finding of a presumption of assistive relevance. *See Hawley*, 302 F.R.D. at 49. Without a presumption of assistive relevance, Elavon must show that the evidence that was destroyed would have been favorable to it or unfavorable to the Friedman Defendants. *Residential Funding*, 306 F.3d at 108-09.

Elavon does not rely on any extrinsic evidence to support its argument that sanctions are warranted. Further, it seems that there are communications between the Friedman Defendants and Transmedia, but Elavon does not rely on any of them to show that the Friedman Defendants' emails were unfavorable to the Friedman Defendants. *See* Dkt. 505 at 20. Where a party requesting an adverse inference presents no evidence to support their motion, "severe sanctions are not warranted." *Orbit One*, 271 F.R.D. at 439 (collecting cases). "It is not sufficient for the moving party merely to point to the fact that the opposing party has failed to produce requested information." *Id.* at 440. Here, because Elavon has not provided any extrinsic evidence, I conclude that Elavon has failed to satisfy the third element. Accordingly, I deny Elavon's motion with respect to the Friedman Defendants.

### III. CONCLUSION

Accordingly, Defendants' motions are **DENIED** and Plaintiff's motion is **GRANTED IN PART** and **DENIED IN PART**.  Based on these findings, Plaintiff is entitled to an adverse inference instruction for the emails for sbrach@gmail.com and EzEtch@gmail.com prior to January 1, 2018.  The parties shall confer on the wording of appropriate adverse inference instructions to be provided to the jury at trial, and provide proposals to Judge Karas as part of their pre-trial submissions.  *See Hawley*, 302 F.R.D. at 56.  The Clerk is respectfully directed to terminate the motions (Dkts. 502, 503, 504).

Dated: April 20, 2022
       White Plains, New York

**SO ORDERED**

Paul E. Davison
United States Magistrate Judge