**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELAVON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NORTHEAST ADVANCE TECHNOLOGIES, INC., SAMUEL BRACH, JOSHUA BRACH, ESTEBAN CASTILLO, JOEL FRIEDMAN, RIVKY FRIEDMAN,<br><br>Defendants. | Civil Action No.: 7:15-cv-7985-KMK-PED<br><br>**DECLARATION OF HOLLY FRANKLIN IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

Holly Franklin, an individual over the age of eighteen, makes the following declaration pursuant to 28 U.S.C. § 1746:

I am the Vice President of Risk Assessment Management of plaintiff Elavon, Inc. As such, I have personal knowledge as to Elavon's procedures and business practices. I have reviewed Elavon's books and records as they pertain to this file and am fully familiar with them. The business records submitted as part of this declaration were made at or near the time of the act recorded by persons with knowledge, and Elavon kept these records in the course of its regularly conducted business activities and making and maintaining them was part of the regular course of its business.

I submit this declaration in opposition to the two separate motions for summary judgment filed by the above-named defendants.

**Elavon and Northeast Advance Technologies, Inc. Enter Into a Contract for the Processing of Credit Card Transactions**

1. Elavon is in the business of assisting its clients – merchants of various kinds – with processing credit card transactions. In essence, using Elavon's equipment and systems, merchants are able to accept credit cards as a form of payment from their customers.

2. In approximately May 2011, Elavon received a Merchant Application from Fidelity Payment Services, Inc. on behalf of defendant Northeast Advanced Technologies, Inc. A true and correct copy of the Merchant Application is included here as Exhibit 3 (beginning on 7 of the PDF). Fidelity's primary responsibility vis-à-vis Elavon is to locate merchants in need of credit card processing services and broker a contract between them and Elavon.

3. A review of Northeast's Merchant Application does not disclose anything out of the ordinary. Northeast identifies its primary business as "engraving products," with an MCC (Merchant Category Code) of 5999, which corresponds to "Miscellaneous and Specialty Retail Shops."

4. The MCC is an important indicator for Elavon because the pricing it offers for card processing services depends in part on the nature of a merchant's business. A higher risk category would necessitate an increased pricing level.

Among the factors that would raise a merchant's risk profile is the number of chargebacks Elavon could reasonably expect on its account. An explanation of the term "chargeback" appears below.

5. Various industries generally have higher chargeback rates, e.g., online gaming sites and airlines. Other industries generally have lower chargeback rates, e.g., restaurants and department stores. Elavon could reject a merchant's application if it deems it to be one with an excessive risk of chargebacks or fraud claims. However, a purported manufacturer of engraving products would likely not be deemed a high risk because merchants engaged in the sale and/or manufacture of physical products, like the restaurants and stores mentioned above, generally do not have many chargebacks.

**Explanation of the Term "Chargeback"**

6. A chargeback is an industry term for what most consumers refer to as a credit card dispute. Broadly speaking, credit cardholders who purchase goods or services from merchants may dispute their purchase for a variety of reasons. For instance, a cardholder may have ordered an item from an online merchant and did not receive it, or received it broken or in non-working order, or made a reservation for a rental car that the rental agency could not honor. If the merchant refuses or is unable to refund the purchase price, the cardholder may contact their card-issuing bank (the "Issuer") and initiate a dispute. If the cardholder's circumstances satisfy

all the elements of a dispute, e.g., non-receipt of a good or service or cancellation of a purchase, and an unrequited request for a refund, the Issuer will initiate a chargeback.

7. It is also important to note that Issuers have sole authority as to whether to accept a chargeback and/or determine whether it is in conformance with the chargeback rules set by the payment networks. Although the payment networks set the rules, Issuers may determine how to interpret and apply them. If an Issuer determines that a cardholder's fact pattern does not present a valid basis for a chargeback, it can deny the request and the cardholder has no further recourse at all within the context of the chargeback mechanism. Cardholders can seek redress through alternative means, including the judicial system against the Issuer and/or merchant, but their request for a chargeback ends with the Issuer's denial.

8. Upon initiation of a chargeback, the Issuer will provide the cardholder a provisional credit for the amount of the dispute. Concurrently, the Issuer will send the facts underlying the chargeback and whatever supporting documentation the cardholder provided to the Issuer to Elavon.[1] Simultaneously, however, Elavon will be debited the amount of the chargeback and a credit provided to the Issuer, and Elavon will deduct the same amount from the merchant's account. The debits and

[1] There are, of course, a number of credit card processing providers other than Elavon. The industry term for these entities is "acquirer."

credits between the Issuer and acquirer are exchanged using the payment network that processed the original transaction, i.e., Visa, MasterCard, American Express, etc.

9. Upon receipt of the chargeback from the Issuer, Elavon communicates the facts to its client merchant and asks if it has a defense, e.g., a refund was issued or a tracking number confirming delivery. If the merchant provides a defense, and it is within the rules for the chargeback, Elavon will communicate the defense to the Issuer. The Issuer and cardholder may then respond to the defense with additional facts or evidence. Ultimately, if the Issuer and Elavon are unable to resolve their clients' differences, a final and binding arbitration will be held under the auspices of the processing payment network.

10. At times, even if Elavon's client merchant does not itself provide a defense, Elavon may respond to the Issuer on its merchant's behalf to protect its interests. Elavon does so because owners of merchants at times forget to respond, or there may be an obvious defense to the chargeback that does not require a merchant's response, e.g., the chargeback was submitted after a deadline established by the payment network rules.

11. If the Issuer/cardholder prevails either because the merchant has no defense or as a result of an arbitration, the formerly provisional credit provided to the cardholder will become permanent. If Elavon/merchant prevails, Elavon will

receive a credit from the Issuer and credit the merchant's account, and the Issuer will revoke the provisional credit to the cardholder.

12. As relevant to this case, it is critical to note that when the Issuer submits a chargeback, it results in a debit to Elavon. Thereafter, Elavon will attempt to debit its merchant's account. But if the merchant has no funds on account and no incoming credit card transactions to debit, Elavon has no further recourse. If the chargeback is ultimately sustained and Elavon cannot obtain compensation from its merchant, Elavon takes the loss.

**From 2011 Until 2015 Northeast Did Not Have a History of Chargebacks**

13. From the time of its boarding with Elavon in the summer of 2011 until approximately May 2015, Northeast's transaction history was unremarkable. A review of Elavon's records indicates routine, intermittent communications between Elavon and Northeast, and sometimes Fidelity. Nothing transpired in those four years to make Elavon consider Northeast to be a higher risk profile.

14. Northeast's Merchant Application indicated that its average sale amount would be $1,000, and its total monthly Visa, MasterCard, AmEx and Discover network sales would be on the order of $30,000. (Ex. 3 at 7). From 2011 to 2015, this amount steadily rose until, by mid-2015, Northeast was processing some $2,000,000 per month. In order to increase Northeast's monthly processing limits, Elavon's records indicate occasional re-underwriting. These determinations

resulted in approvals of elevated processing amounts largely because Northeast had very few, if any, chargebacks or, more importantly, claims of fraud or unauthorized transactions. A steadily increasing processing amount in and of itself does not raise any red flags because it simply indicates that a business is slowly flourishing. Many of Elavon's merchants undergo a similar phenomenon.

**In May 2015, Northeast Began to Receive a High Number of Chargebacks**

15. Northeast's merchant account began to receive a high number of chargebacks beginning in May 2015. This caused concern primarily because Northeast had so few chargebacks in its history.

16. As a result of the numerous chargebacks, Elavon's Loss Prevention department attempted to contact Northeast but was unsuccessful. Shortly thereafter, Elavon asked Craig Dotlo – a retired law enforcement officer – to visit Northeast's office. He prepared a report that is annexed hereto as Exhibit 5. In summary, Mr. Dotlo talked with Esteban Castillo, who said he and another unnamed person were Northeast's owners but refused to answer other questions. Mr. Dotlo's conclusion was that "it did not appear there were any employees at the location and it did not appear that much business was being transacted in this location certainly to justify monthly sales of $2.5 Million."

17. Right around the time Elavon received Mr. Dotlo's report, we decided it would be prudent to take a reserve of approximately $230,000 and bar Northeast

from processing any further transactions. A reserve is essentially a sum of money that Elavon sequesters from incoming transactions as a hedge against chargebacks. Taking a reserve has nothing to do with the merchant's bank account.

18. Also around this same time, we received a phone call from Noah Shelanski, Esq., an attorney in New York City. Mr. Shelanski said he was speaking on behalf of the owners of Northeast (though not necessarily representing them), and said that Esteban Castillo was not an owner. However, he refused to provide the name(s) of the owner(s). I do not recall the details of the conversation, but Mr. Shelanski generally hinted that the chargebacks were the result of a short-term lending arrangement between Northeast and the cardholders. He also informed us that the total amount of incoming chargebacks would be on the order of $2.2 million. Mr. Shelanski told us that his main objective was to create a dialogue and work out a settlement or plan for compensating Elavon. Ultimately, no settlement proposal was made.

**Elavon Eventually Receives Some $2.2 Million in Chargebacks and Its Investigation Reveals a Collusive Manufactured Spending Fraud**

19. At the time of the chargebacks, Elavon was not yet fully cognizant of the type of scheme it now refers to as a "collusive manufactured spending fraud." Having gone through this litigation and others, Elavon now has general knowledge of the contours of the scheme.

20. In a collusive manufactured spending fraud, the merchant opens an account with an acquirer and begins processing credit card transactions with one or more trusted cardholders. On Day 1 of the scheme, the merchant will charge, for instance, $500 to a cardholder's card. This results in a credit to the merchant of $500 less processing fees, usually 2-3%. Correspondingly, the cardholder will incur a $500 debit on their account with an Issuer that must be repaid within 30 days (or longer, depending on the Issuer's agreement with the cardholder).

21. At the end of 30 days, the merchant will process a transaction in the amount of, for instance, $1000 using either the same credit card or another card belonging to the same or a different cardholder. Five hundred dollars of that transaction will be used to repay the original cardholder's debit, and leave the merchant with another ~$500. The following month, the maneuver is repeated and so on every month. There are variations to the scheme including, for instance, the use of multiple cards per month, whether the scheme is "pure" fraud in the sense that the merchant has no legitimate business activity, etc. In this case, our investigation has determined that while Northeast may have had some minimal legitimate business operations, all of the credit card transactions it processed from 2011 through 2015 were part of the manufactured spending fraud involving various cardholders.

22. The manufactured spending fraud is very similar to a Ponzi scheme. In a traditional Ponzi scheme, the mastermind offers investors returns from some

business operation. In reality, there is no business operation, and the initial investor is paid back from investments made by subsequent investors. The amounts necessary to reimburse each successive investor grow higher and higher until the mastermind is unable to find sufficient future investors or capital to repay the earlier investors. At that point, the Ponzi scheme collapses, and the most recent investors are "left holding the bag."

23. The manufactured spending fraud is the same, except that in lieu of a series of investors, the mastermind uses a series of credit cards. In a Ponzi scheme, the rewards to the investors are the returns on the investment, whereas in the spending fraud it is usually the rewards offered by Issuers, e.g., airline miles, cash back, etc., though the cardholders may also receive funds from the manufactured spending scheme itself. Although a typical consumer's rewards are not high, by 2015 Northeast was processing over $2 million per month, and much of it using credit cards belonging to defendants Joel and Rivky Friedman. That kind of volume provides significant cash back and airline miles.

24. Further, when a Ponzi scheme invariably collapses, the last investors typically have no recourse except to pursue the mastermind, who normally is either penniless or has absconded. In the manufactured spending fraud, however, the cardholders do have recourse: the chargeback.

**The Cardholders Colluded With Northeast to Process the Chargebacks In a Manner Impossible for Elavon to Combat**

25. Here, the collapse of the scheme occurred when Elavon barred Northeast from processing further transactions. Without the ability to charge more to pay off the cardholders' prior debts, and with very little, if any, legitimate business earnings, Northeast could not repay the cardholders' debts to their Issuers resulting from the hundreds of charges Northeast made to their cards in the month leading up to Elavon's cessation of processing.

26. As a result, the cardholders retained the services of TransMedia Payment Systems, Ltd., which is an expert in the field of chargebacks. With TransMedia's assistance, the cardholders initiated hundreds of chargebacks for a "credit not processed." A "credit not processed" chargeback occurs when a merchant agrees to credit a cardholder for some reason, but then fails to follow through. For instance, a cardholder who is unsatisfied with some service may ask for a refund, and the merchant may agree to provide a refund back on to the credit card but does not follow through. Generally speaking, to initiate a credit not processed chargeback the cardholder must only claim to the Issuer that a merchant received a cancellation request from the cardholder, agreed to a credit but did not provide it, and also offer some documentary proof of the promise from the merchant.

27. Northeast and the cardholders in this case were colluding. Therefore, Northeast, with TransMedia's guidance, drafted letters to the cardholders advising

that it received the cardholders' cancellation requests and confirmed that a refund was due, but that it could not issue the refund due to some financial difficulties. In turn, the cardholders contacted their Issuers and, referring them to Northeast's letters, initiated the chargebacks that are the issue in this action. In so doing, the cardholders were ostensibly able to meet the requirements of the "credit not processed" chargeback: a claim by the cardholder that a merchant promised a refund but did not provide it, and written confirmation of the promise from the merchant.

28. When Elavon received the chargeback notices and cancellation letters from the Issuers, it forwarded them to Northeast for review. Of course, Northeast did not respond to Elavon because it was colluding with the cardholders and intended for the chargebacks to be successful. But because Elavon had not had extensive dealings with this type of fraud before, we did not realize that Northeast and the cardholders were colluding. As a result, we defended the chargebacks on Northeast's behalf by arguing to the Issuers that Northeast's letters may have been forgeries. In response, Northeast submitted a follow-up letter from its counsel, Mr. Shelanski, that confirmed the letters' authenticity. (*See* Exhibit 6). I believe this is how we first learned of Mr. Shelanski's name.

29. In view of the cardholders' claim combined with Northeast's letters, Elavon had no ability to defend against the chargebacks. We considered advising the Issuers and/or the payment networks that Mr. Shelanski informed us that the

transactions between Northeast and the cardholders were loans, but we had no evidence because Mr. Shelanski did not provide Elavon anything in writing, and would not even tell us whom he represented.

30. In addition, the payment network chargeback rules mandate that the acquirer respond to an Issuer within 30 days of the chargeback submission date. After that deadline, the chargeback is considered final and there is no opportunity under the rules to obtain an extension. Even if we had launched an immediate investigation, we would not have been able to come up with proof that the transactions were loans within those deadlines. In fact, we did not have concrete evidence of the transactions being loans until 2019, when our counsel subpoenaed now-defendant Joel Friedman and confirmed our beliefs.

31. It is our belief that had the cardholders been forthright about the transactions being loans, two things likely would have happened. First, the Issuers would probably not have permitted the cardholders to initiate the chargebacks. Second, or in the alternative, the payment networks would have agreed that the chargebacks were either improper to begin with, or that Elavon had a legitimate non-chargeback-based grievance against the Issuers. In either scenario, Elavon would have avoided all or much of its eventual losses.

32. Annexed hereto as Exhibit 1 is a true and correct copy of excerpts from Elavon's Eclipse notes related to Northeast. Eclipse is a system Elavon uses to keep track of communications with merchants.

33. Annexed hereto as Exhibit 2 is a true and correct copy of excerpts from Elavon's Advanced Risk Management System (ARMS).

34. Annexed hereto as Exhibit 3 is a true and correct copy of Elavon's onboarding package for Northeast.

35. Annexed hereto as Exhibit 4 is a true and correct copy of a bank account change request form executed by Esteban Castillo.

36. Annexed hereto as Exhibit 5 is a true and correct copy a report prepared by Craig Dotlo following his visit to Northeast's office.

37. Annexed hereto as Exhibit 6 are true and correct copies of communications Elavon received from the Issuers.

38. Annexed hereto as Exhibit 7 are true and correct copies of Elavon's monthly statements to Northeast.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 12, 2022

Holly Franklin
Holly Franklin (Aug 12, 2022 11:49 EDT)

HOLLY FRANKLIN