COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
ELAVON, INC.,

Plaintiff,

-against-

Case No.:
7:15-CV-7985(KMK)(PED)

NORTHEAST ADVANCE TECHNOLOGIES, INC.,
SAMUEL BRACH, JOSHUA BRACH, ESTEBAN
CASTILLO, JOEL FRIEDMAN and RIVKY FRIEDMAN,

Defendants.
-----------------------------------------X

October 20, 2021

9:37 a.m.

DEPOSITION of the Plaintiff, ELAVON, INC., by a witness, HOLLY FRANKLIN, taken by the Defendant, pursuant to a Court Order and to the Federal Rules of Civil Procedure, taken via videoconference, before Jennifer Schwartz, a Notary Public of the State of New York.

SANDY SAUNDERS REPORTING
254 South Main Street, Suite 216
New City, New York 10956
(845) 634-7561

sorry. If I'm understanding the question correctly, so, Elavon is always trying to act in the best interest of our merchant. And generally, in a best case scenario, there's communication with our merchant and strategy related to chargeback. But in the absence of certain levels of communication or in certain situations where there's obvious way we can represent a chargeback, we would do so on our merchant's behalf, always to the benefits of our merchants, trying to help them win disputes.

Q. In the event that a merchant is in the wrong in connection with a charge, is there any exposure to Elavon as a result of that?

A. There is. If a merchant lose a chargeback or a chargeback comes in against our merchant, there's a financial -- we attempt to recoup the amount of that dispute from our merchant. The merchant doesn't have funds available to cover it, Elavon is left holding that debt because we already returned those funds to the issuer.

H. FRANKLIN

Q. And so, if I understand what you're saying is that the merchant Northeast informed, in this case, Fidelity who took the application -- well, I don't want to say on behalf of Elavon, but been forwarding it to Elavon and represented that monthly sales would be $30,000; is that right?

A. Yes.

Q. Incidentally, what's the relation to Fidelity and Elavon?

A. They are referal build partner of Elavon.

Q. Is it fair to say they're actually the one who signs the merchant up?

A. That's correct, and they referred this account to Elavon.

Q. Oh, I see. Fidelity could have referred to a different acquiring bank?

A. Yes.

Q. If you go down one more page to Page 8, it says towards the bottom, the bottom right box, other card types, new. It says American Express, 15,000 monthly;

it sounds like Shelanski was a fixed point that we can maybe have a date for; is that right?

A. From what I recall, yeah, it's probably around that timeframe, early July.

Q. Now, you mentioned that loans -- that the activity was prohibited on Northeast's end by the agreement between Elavon and Northeast, correct?

A. Correct, it wasn't widely used for this account.

Q. Valid, okay, that was the term.

And you also agreed that the cardholder defendants are not bound by that agreement, correct?

MR. GINZBURG: Object to form.

A. So, open to some interpretation, but we don't believe that that's a valid use of that account and/or a valid transactional reason for any businesses set up for the sales of goods and services to be accepting loans.

Q. But again, that's from Northeast's end, not from the cardholder

A. No, I'm not.

Q. Now, I'm going to refer you back to paragraph 29, which reads, just for the record, "Castillo did not have an opportunity to rereview the merchant application before Northeast and the Brachs submitted it to plaintiff."

You can look into the body of the complaint, but I think it's a fair summary and representation that the use of the word "Brachs" in this paragraph as defined in the complaint means both Joshua Brach and Samuel Brach.

As you sit here today, are you aware of any actions by either Samuel Brach or Joshua Brach in submitting a merchant application to Elavon?

A. I'm not aware of specific actions, no.

Q. So, for example, if I asked you specifically are you aware of any actions by Joshua Brach to submit any merchant application to Elavon, are you able to identify any such actions?

A. No.

them.

Q. I'm not asking you -- as you sit here today, can you give me any facts that would lead Elavon to believe that Joshua Brach at any time submitted a merchant application to Elavon?

A. I'm -- I haven't reviewed those details, so I can't speak to any specific actions related to that.

Q. What about Sam Brach, same question?

A. And that would be the same answer.

Q. It says after that, "S. Brach did not use his own name on the merchant application, but he has reason to believe that the plaintiff would not have approved the merchant application if his name were on it."

Do you see that?

A. I do.

Q. Are you aware of any facts or circumstances that support the allegation in that second paragraph of 162 of the complaint?

A. I'm not aware of specifics, but I think it's a logical conclusion if they are using another party's name, that there's -- the

reason was the actual -- was the party that ran the business did not want his name associated with that business.

Q. As you sit here today in your review and investigation of this matter, are you aware of any reason, at the time the merchant application was first submitted to Elavon, why the use of Sam Brach's name would have changed the approval of the merchant application with Elavon?

A. I can't guess as to what the outcome would have been if he had, but I would assume there was a reason that it wasn't listed.

Q. My question, ma'am, wasn't whether or not you assumed a reason. Is there any facts that you can provide today why Elavon would not have approved the merchant application on the date of its submission if Sam Brach's name had been used on the merchant application instead of Esteban Castillo?

A. Understood.

No, I can't speak to what would have happened if that had been the case.

Q. Now, I'm going to refer you to

page 25 of the complaint, which is a count for unjust enrichment. I'm going to refer you to paragraph 167. It says, "The cardholder defendants engaged in a fraudulent scheme intended to shift the debt from the Northeast transactions from themselves to plaintiff."

Can you describe what you believe that paragraph is referring to?

A. Yes. It's the -- the general basis of the scheme in which the cardholders shifted the liability for their bad loan, loan debt, to Elavon rather than taking on that debt burden themselves.

Q. Can you -- as you sit here today, based upon your investigation of the Elavon record and any records that you reviewed in advance of this deposition, can you describe to me any factual basis, if any, why Joshua Brach would be involved in any fraudulent scheme?

A. As with all of these questions, I'm sure there is documentation out there. I'm not familiar -- I don't have recall of all the documentation in this case, so no, I can't speak to those specific -- his specific ties.

Q. As you sit here today, do you recall any specific ties from Joshua Brach to any fraudulent scheme?

A. Again, it's likely included in the volumes of documentation in this case, but I can't speak directly to them. I don't have recall over all of that information.

Q. Same question as to Sam Brach.

A. And that would be the same answer.

Q. Now, do you know whether or not Joshua Brach, based upon any of the records that you have reviewed in connection with your investigation or this litigation, received any financial benefit from any of the collusive manufactured spending fraud you referred to in your testimony earlier today?

A. Again, that information likely is contained within the numerous documents that are part of this case. But I don't recall the specific allegations or the specific details that would define that.

Q. Right. But as you sit here today, are you aware of any financial benefit that Joshua Brach received at any time?

Q. After the Shelanski meeting, what did Elavon believe that these charges were?

A. We were already being pointed in that direction by all the various information, but suspecting it is one thing; being able to prove it is quite another. And even if we had, that still gives us no real recourse with the chargebacks that are coming in to have the cardholder stating they're owed a refund and the merchant stating that they're owed a refund. Doesn't really give an acquirer any options.

Q. So are you saying that Elavon had no -- are you saying that irrespective of what Elavon knew, that they were loans, their hands were tied in fighting the chargebacks?

A. Yes, that's largely correct. There is not a lot Of avenues to explore related to that.

Q. So how is Elavon deceived if they had no choice but to accept the chargebacks?

A. Because we had nothing we could have provided to refute those claims. We had nothing concrete, nothing in writing, no documentation. And even if we had, given the

nature of the merchant supporting the cardholder's claim that refunds were due and providing documentation to that effect, that was information that would -- that was information that would have been used for the decisioning on this dispute.

Q. I guess I'm not understanding. If they were -- if these chargebacks were loans and assuming that they had been disclosed as loans, what you are telling me is that Elavon would have had no ability to reject the chargebacks no matter what?

MR. GINZBURG: Object to form.

A. No. What I'm stating is they wouldn't have gotten to that point, because issuers likely would not have moved forward with the cardholder stating -- calling them saying, I made a bad loan and I lost my money and I want you to help me get my money back by submitting a chargeback.

Q. So what you're saying is that the issuing banks were misled, but not Elavon?

A. Elavon had no other information to rely on other than information the cardholder

and the merchant provided.

Q. But you can't -- Elavon can't have it both ways. They can't say they were misled, and paragraph 122 says that revealing the fact that it was a loan would be fatal to the chargeback requests, and at the same time concede that they had no choice, that if the chargeback was based on a loan and would have gotten to Elavon's door, they couldn't have been refuted?

A. I don't understand that conflict.

Q. How could you not understand the conflict?

As I understand what you have just said more than once, that a loan would not have been a sufficient reason to reject the chargeback, and that, your testimony as well, it wouldn't have gotten to Elavon because the issuing banks would have rejected it, maybe.

But the bottom line is, is that Elavon is complaining in this lawsuit that they were materially misled and they relied on this misleading information, and absent this misleading information that they relied upon,

they wouldn't have been defrauded. But none of that is true, because regardless of any of that, had they submitted a chargeback -- or tried to fight a chargeback based on a loan chargeback, they wouldn't have won that chargeback. So irrespective of how it played out, they would have been held -- they would have been holding the amount charged back.

Where am I wrong in what I just said?

A. Because in your argument you are not accounting for the fact that if we had known up front and it had been disclosed, one, the chargeback may not ever have occurred because the issuer wouldn't have allowed it; two, we would have had concrete proof that it was a loan and would have used that information. Because we didn't have that proof, we had nothing in writing that said this was a loan. If they put it in writing that this was a loan, that could have changed this whole scenario. But, you know, I can't guess about what would have transpired had that occurred.

Q. I don't understand how you're -- I

Q. If Elavon didn't believe the cardholders' statements in support of their chargebacks, wouldn't have Elavon fought those chargebacks based on that?

A. The chargeback process is not based on Elavon's belief at all. Elavon has no decisioning role in a chargeback.

Q. But --

A. What we believe is what we could prove and what would be accepted by the issuing banks as a valid representment.

Q. Did you ever believe the cardholders? How's that?

A. Personally?

Q. Well, I don't know about you personally. Elavon.

A. I would say that we always doubted the validity of these claims.

Q. So you never -- throughout the chargeback process of almost 400 chargebacks, you never really believed the cardholders, right?

A. But it's the only information we had to rely upon, and our merchant was providing