**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELAVON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NORTHEAST ADVANCE TECHNOLOGIES, INC., SAMUEL BRACH, JOSHUA BRACH, ESTEBAN CASTILLO, JOEL FRIEDMAN, RIVKY FRIEDMAN,<br><br>Defendants. | Civil Action No.: 7:15-cv-7985-KMK-PED |

# PLAINTIFF'S RESPONSE TO THE LOCAL CIVIL RULE 56.1 STATEMENT OF DEFENDANTS JOEL FRIEDMAN AND RIVKY FRIEDMAN

**Statement No. 1.** Joel and Rivky Friedman are husband and wife. Joel Friedman and Samuel Brach ("Sam" to distinguish him from Joshua Brach, his son and co-defendant) are brothers-in-law.

**Response**: Elavon is without sufficient knowledge or information to respond to this Statement, and it is therefore **DENIED**.

**Statement No. 2.** A credit card transaction is initiated when a credit card holder authorizes a charge by a merchant to a card account number, the credit card information is transmitted to the merchant's credit card processor (known as the "acquirer") who then transmits the information using the payment network (e.g., Visa or Mastercard) to the credit card holder's issuing bank (known as the "issuer") who verifies the account and authorizes the charge. Yurowitz Decl., Exhibit 1 (Third Amended Complaint) ("TAC") at ¶39.

**Response**: Admitted.

**Statement No. 3.** If the charge is approved, the issuer communicates that approval to the acquirer who transmits the approval to the merchant and the transaction is consummated. Exhibit 1 at ¶¶40-41.

**Response**: Admitted.

**Statement No. 4.** Within a certain amount of time thereafter (generally 24 to 72 hours), the acquirer credits the merchant with funds from the transaction, less any processing fees. Exhibit 1 at ¶43.

**Response**: Admitted.

**Statement No. 5.** The acquirer is then reimbursed by the issuer through the payment network and the issuer in turn debits its cardmember. Exhibit 1 at ¶44.

**Response**: Admitted.

**Statement No. 6.** Plaintiff Elavon, Inc. ("Elavon") is an acquirer and with whom defendant Northeast Advance Technologies, Inc. ("Northeast") maintained a merchant account with Elavon [sic] until Elavon terminated the merchant account in June of 2015. Exhibit 1 at ¶¶18, 39; Exhibit 37 at Elavon 000358.

**Response**: Admitted.

**Statement No. 7.** The Friedmans, or businesses owned by them, had credit card accounts with a number of different issuers, including Chase, Capital One, Citibank, Bank of America, Key Bank, Barclays Bank and American Express. Yurowitz Decl. at ¶4.

**Response**: Admitted.

**Statement No. 8.** For a variety of reasons, a credit card holder may dispute a transaction made on his credit card. The process of disputing a transaction is referred to as a "chargeback." Exhibit 1 at ¶45.

**Response**: Admitted.

**Statement No. 9.** Through the chargeback process an issuer can obtain the return of funds from an acquirer that were previously paid as part of a credit card transaction. Exhibit 1 at ¶¶46, 49.

**Response**: Admitted.

**Statement No. 10.** The chargeback process is initiated by a credit card holder contacting his issuer and informing them that he or she disputes a particular charge. Exhibit 1 at ¶47. In certain circumstances, an issuer can also initiate chargebacks on their own. There are numerous grounds for commencing a chargeback, including goods or services not provided and a credit not processed. Exhibit 38 (Mastercard Chargeback Guide at 224, 241).

**Response**: **DENIED** that the cited documents state that issuers may initiate chargebacks on their own, though that possibility is irrelevant to this action. The balance of this Statement is admitted.

**Statement No. 11.** Under the program network rules, issuers are required to make available to their cardholders all protections and rights available under the program network rules. Exhibit 39 (Visa Core Rules 11.1.2).

**Response**: Admitted.

**Statement No. 12.** Once the issuer determines that a valid chargeback right exists, it forwards the dispute via the payment network to the acquirer. Exhibit 1 at ¶47.

**Response**: Admitted.

**Statement No. 13.** Within each chargeback category or code, the payment networks have specific conditions and information that must be transmitted by the

issuer to the acquirer. Exhibit 40 (Sutherland 22:22-23:4). [redacted] Exhibit 41 (Klein 124:1-23).

**Response**: Admitted.

**Statement No. 14.** When an acquirer receives a chargeback claim, it forwards the information it received from the issuer to the merchant, requesting the merchant's response to the chargeback claim. Exhibit 1 at ¶48.

**Response**: Admitted.

**Statement No. 15.** Where a chargeback claim is substantiated or not disputed by the merchant, the acquirer debits the chargeback amount from the merchant's account and transfers the funds to the issuer. Exhibit 1 at ¶49. If the merchant does not have adequate funds to cover the debited amount, the acquirer is responsible for any shortfall. Exhibit 1 at ¶51. The issuer in turn will credit the cardholder's account by either applying the chargeback amount against the balance due on the account or, to the extent the credit exceeds the balance due, as a credit balance.

**Response**: **DENIED** that the acquirer transfers chargeback-related funds to the issuer only where a chargeback claim is substantiated or not disputed by the merchant. In actuality, the acquirer transfers the funds to the issuers immediately upon submission of the chargeback by the issuer to the acquirer. (Franklin Declaration ¶ 8). The balance of the Statement is admitted.

**Statement No. 16.** [redacted] Exhibits 42 (Strenge 139: 9-17) and 43 (Stump 25:13-20, 26:12-15, 99:7-18).

**Response**: Admitted.

**Statement No. 17.** If the merchant refuses to accept the chargeback claim, it "represents" (Visa's term) [redacted] (Mastercard's term) [redacted]. Exhibit 39 (Visa Core Rules at Glossary); Exhibit 44 (Whiteside 24:3-5).

**Response**: Admitted, though these issues are irrelevant to this action.

**Statement No. 18.** [redacted]. Exhibit 45 (Sheehan 93:11-20) and Exhibit 44 (Whiteside 22:23-24:16). At that point, the acquirer must decide within a certain timeframe whether to accept liability and avoid an arbitration or to decline to accept liability and continue to arbitration.

**Response**: Admitted, though these issues are irrelevant to this action.

**Statement No. 19.** While he does not recall when it started, by the latest 2013 Joel Friedman allowed Sam to swipe various of Friedman's credit cards in order to make short-term loans to Sam, who he understood was associated with Northeast, on the understanding that Sam would repay the charges on Friedman's credit accounts as they became due. Exhibit 46 (Friedman 58:18-59:5; 67:4-12).

**Response**: Admitted that this is a fair description of Friedman's testimony, but Elavon is without sufficient knowledge or information to respond as to whether this Statement is accurate, and it is therefore **DENIED**.

**Statement No. 20.** At some point in 2015, Friedman told Sam to stop swiping his cards. Yet, despite Friedman's instructions, Sam continued to charge Friedman's cards. Exhibit 46 (Friedman 64:23-65:2); Exhibit 47 (Friedman 16:12-17:24, 19:4-22).

**Response**: Admitted that this was Friedman's testimony, but **DENIED** that it is truthful. Friedman testified that he contemporaneously pleaded with Samuel Brach to stop using his credit cards, but also did nothing to stop him from using the cards at his leisure because Samuel Brach was timely repaying his balances. (Declaration of Daniel Ginzburg, Ex. 1 at 16:12–18:10). Friedman testified further that he could have asked his issuing banks (each, an "Issuer") to provide him new credit cards but chose not to because he needed the cards for his business. (*Id.* at 18:11-20). Alternatively, Friedman claimed he he did not obtain new cards because he did not think he needed to obtain new cards, even though the person he was pleading with to stop using his credit cards refused to stop. (*Id.* at 18:21–19:3).

**Statement No. 21.** Mr. Friedman believed that Sam was repaying him through the earnings from his business. Exhibit 46 (Friedman at 61-62, 69-70)

**Response**: **DENIED**. Friedman testified exactly to the contrary: "Q. Did you have any understanding of where the money came from that Mr. Brach used to pay it [the loans] back? A. No." (Ginzburg Decl., Ex. 2 at 61:24–62:2). Subsequently he testified as follows: "Q. I may have asked this, but did you have any idea where he was getting the money to pay down your credit card accounts? A. No." (*Id.* at 69:21-23).

**Statement No. 22.** In May 2015, Sam advised Mr. Friedman that his accounts had been frozen. Exhibit 46 (Friedman 107:13-20).

**Response**: **DENIED**. Friedman's testimony at the pages cited is different than what is asserted in this Statement.

**Statement No. 23.** In fact, in late May, Elavon, the company with whom Northeast maintained a payments processing merchant account, placed a hold on Northeast's account and withheld funding of a few hundred thousand dollars in deposits from Northeast. Exhibit 1 at ¶75.

**Response**: Admitted, though the amount actually reserved was $230,000. (Franklin Decl. ¶ 17).

**Statement No. 24.** Sam informed Mr. Friedman that he would issue refunds to the cards to return the outstanding charges. When Mr. Friedman checked with his bank

a few days later whether the refunds had posted they could not confirm any such refunds. The bank thereafter informed Friedman that if he could provide them with confirmation of the refunds from Northeast they could open a dispute case. Exhibit 46 (Friedman 107-108).

**Response**: Admitted that this was Friedman's testimony, but Elavon is without sufficient knowledge or information to respond as to whether this Statement is accurate, and it is therefore **DENIED**.

**Statement No. 25.** By late May 2015, at the latest, Elavon had become suspicious of the transaction activity and the number of chargebacks on Northeast's merchant account. For example, On May 29, 2015, Elavon's account manager opened a "take action request form" requesting that Elavon establish a security reserve for Northeast's merchant account due to "excessive chargebacks." Exhibit 37 at ELAVON 000354-56. The request was approved by a manager that same day. Id.

**Response**: **DENIED**. By late May 2015 Elavon decided to take a security reserve of $230,000 "as a hedge against chargebacks," not because it was suspicious of any transaction activity. (Franklin Decl. ¶ 17).

**Statement No. 26.** On June 3, 2015, Elavon's account manager determined that, based on Northeast "not processing as approve[d] and having large chargebacks coming in," that Elavon would "exit the relationship and close the account." Exhibit 37 at ELAVON 000358.

**Response**: Admitted.

**Statement No. 27.** That same day, Elavon wrote to Northeast to advise that, in accordance with its merchant agreement with Northeast, "[e]ffective June 15, 2015, this merchant processing relationship is terminated and Elavon will no longer process credit card transactions for Northeast." Id.

**Response**: Admitted.

**Statement No. 28.** On June 16, 2015, Elavon formally terminated its payment processing relationship with Northeast and added Northeast "to the MATCH file," due to Northeast's "large amount of chargeback[s]" and its "violation of MasterCard Standards." Exhibit 37 at ELAVON 000358.

**Response**: **DENIED** because the quoted remarks do not appear at Exhibit 37.

However, the Statement itself is generally accurate.

**Statement No. 29.** On or about June 19, 2015 an outside investigator (Craig L Dotlo) hired by Elavon conducted a Site inspection at the business address of Northeast. According to the site inspection there was no legitimate business operations being conducted and the logical assumption by Elavon was that everything they processed was fraudulent activity. Exhibit 48 (Franklin) at 222. About one week later on June 26, 2015, Dotlo had a phone conversation with criminal defense attorney Noah Shelanski who indicated that he was representing Northeast and the two discussed the suspicious circumstances concerning Northeast business. Exhibit 50 at Elavon 005495-005500.

**Response**: **DENIED** that Craig Dotlo concluded "there was no legitimate business operations being conducted" at Northeast's office. Mr. Dotlo wrote in his report: "Based on briefly observing the Northeast Office space, it did not appear there were any employees at the location and it did not appear that much business

was being transacted in this location certainly to justify monthly sales of $ 2.5 Million." (Ginzburg Decl., Ex. 3 at 1). Also **DENIED** that Mr. Shelanski "indicated that he was representing Northeast." Mr. Dotlo's report of the conversation did not state that Mr. Shelanski revealed the name of his client. (*Id.*, Ex. 4 at 1). Further, Mr. Shelanski avoided revealing the name of his client in conversations with Elavon. (Franklin Decl. ¶ 18). The balance of the Statement is generally accurate.

**Statement No. 30.** Elavon's suspicions concerning the underlying charges were confirmed when on July 6, 2015, Elavon employees communicated with Shelanksi [sic], who informed them that Elavon 1) could expect as much as $2 million in chargebacks, 2) that the underlying transactions were for loans extended to Northeast by the cardholders, and 3) that the credit letters (discussed below) were authorized by Northeast. Exhibit 58 (Response No. 10 to Friedman's Interrogatories); Exhibit 48(Franklin 115:7 -117:16, 122:8-22).

**Response**: **DENIED** that Mr. Shelanski definitively stated that the underlying transactions were loans. Ms. Franklin recalls that Mr. Shelanski only "generally hinted" that the transactions were loans. (Franklin Decl. ¶ 18). Also **DENIED** that Mr. Shelanski's confirmation that the credit letters were authorized by Northeast came via communication with Elavon, and the evidence cited here does not indicate this occurred.

**<u>Statement No. 31.</u>** By the time Elavon had met with Northeast's counsel on July 6, Elavon had come to the "general conclusion" based on "multiple factors" that the subject transactions were loans. Exhibit 48 (Franklin 224:1-225:6).

**<u>Response</u>**: **DENIED** that Mr. Shelanski had ever identified himself as "Northeast's counsel." Rather, he stated he "he was speaking on behalf of the owners of Northeast (though not necessarily representing them), and said that Esteban Castillo was not an owner. However, he refused to provide the name(s) of the owner(s)." (Franklin Decl. ¶ 18). The balance of the Statement is generally accurate.

**<u>Statement No. 32.</u>** At the earliest, Elavon received the first of the Friedmans' chargeback claims on June 30, 2015. Exhibit 2. By July 20, 2015, Elavon had received less than 10 of the Friedmans' chargeback claims, for a total amount of less than $35,000. Exhibit 2; Yurowitz Decl. at ¶5.

**<u>Response</u>**: Admitted.

**<u>Statement No. 33.</u>** Friedman consulted with and retained Intercept Advisory Firm, Ltd. d/b/a as Transmedia ("Transmedia") and its principal Bernard Klein, a company that worked in the credit card industry and specialized in chargebacks, concerning what remedies he may have. Exhibit 1 at ¶112; Exhibit 46 (Friedman I at 45-46).

**<u>Response</u>**: Admitted that Friedman consulted with and retained TransMedia. **DENIED** that Friedman revealed that fact during his February 7, 2019 deposition (Yurowitz Decl., Exhibit 46).

**Statement No. 34.** [redacted] Exhibit 41 at 52.

**Response**: This was Mr. Klein's testimony, but Elavon is without sufficient knowledge or information to respond to this Statement, and it is therefore **DENIED**.

**Statement No. 35.** [redacted]. Exhibit 41 (Klein) at 50, 80-83. The credit letters were signed by Sam Brach on behalf of Northeast. Exhibit 59 (Sam Brach at 247:23-24).

**Response**: This was Mr. Klein's testimony, but Elavon is without sufficient knowledge or information to respond to this Statement, and it is therefore **DENIED**. Admitted that Samuel Brach signed the credit letters on behalf of Northeast.

**Statement No. 36.** [redacted]. Exhibit 41 at 107-108.

**Response**: Admitted that that may have been TransMedia's advice to Friedman, but **DENIED** that it is accurate. Ms. Franklin testified that Elavon interpreted the Visa and MasterCard rules not to permit chargebacks of unpaid loans. (Ginzburg Decl., Ex. 5 at 226:23–227:24). A representative of JPMorgan Chase Bank, N.A. agreed, stating [redacted]

[redacted] (Ginzburg Decl., Ex. 6 at 270:4–271:4). Also, Chase Bank's notes indicate that upon submitting his dispute, Friedman was told: [redacted]" (Ginzburg Decl., Ex. 14 at JPM0001230, 1232, 1234, etc.). A Citibank, N.A. representative likewise explained to Friedman: "[T]he Visa Association requires the specific reason for a credit slip or a credit advisement. We cannot just submit a credit slip or credit advisement on its own without the information why the credit was to be issued." (*Id.*, Ex. 9). A representative of Visa agreed as well, stating that entities not expressly engaged in the business of lending should not be processing loan transactions, and that a chargeback of a loan transaction that misidentifies the transaction or is materially incomplete in the description of the transaction is improper pursuant to the Visa rules. (*Id.*, Ex. 7 – Sheehan Declaration ¶¶ 4-7). A representative of MasterCard also agreed that [redacted] (*Id.*, Ex. 8 at 139:23–142:19).

**<u>Statement No. 37.</u>** In June 2015, Friedman began submitting credit letters to his issuing banks in support of chargeback claims as to various Northeast transactions. Exhibit 2.

**<u>Response</u>**: Exhibit 2 is a listing of chargebacks and dates and does not specify when Friedman began submitting credit letters to his issuing banks. However, the timeline is generally accurate.

**<u>Statement No. 38.</u>** In his communications with the issuing banks, Friedman refused to provide information regarding the nature of the underlying transactions, which Transmedia advised him was irrelevant. Exhibit 41 at 107-108.

**<u>Response</u>**: **DENIED**. Friedman told Chase that the underlying transactions were for [redacted]." (Ginzburg Decl., Ex. 10). Friedman told Citibank that the transactions were for "diamond engraving equipment to be shipped to the CM [cardmember] in mid June." (*Id.*, Ex. 11). Friedman told Capital One Bank (USA), N.A. that [redacted] (*Id.*, Ex. 12 at 7). Friedman told Bank of America, N.A. that the purported reason for his cancellation of service or merchandise is that he "no longer needed" it. (*Id.*, Ex. 13 at 2). Each of these were misrepresentations.

**Statement No. 39.** [redacted] Exhibit 43 (Stump 27:25-29:5, 36:5-24). A representative of the issuer will at times fill out forms in their own words and record notes based on their own analysis of the information collected. Exhibit 54 at JPM000812, and pages 426-427, 439-442.

**Response**: Admitted that Chase Bank's representative [redacted], but **DENIED** that the [redacted] Rather, the example the representative provided [redacted] (Ginzburg Decl., Ex. 6 at 27:21–28:13), and this is what Friedman's specialist did (*id.*, Ex. 14 at JPM00812).

**Statement No. 40.** [redacted] Exhibit 44 (Whiteside 31:13-16); Exhibit 60. With respect to the necessary documentation required for a "credit not processed" transaction, those requirements are set forth in the Visa, Mastercard or American Express rules.

**Response**: Admitted.

**Statement No. 41.** Mastercard's rules provide that the following documentation is all that is needed for a credit not processed chargeback under Reason Code 4860:

> • A credit slip issued by the merchant containing an account number (even if truncated).
> • A Credit Advice usually described as a letter from the merchant indicating credit is due to the cardholder. A Credit Advice will contain an account number (even if truncated).
> • A merchant statement indicating that the merchant cannot issue credit; or, the cardholder must contact their bank to obtain credit via chargeback (or words to that effect). This document does not require an account number.

Exhibit 44 ([redacted]; Exhibit 38 at 241). The credit letters issued by Northeast satisfy all the requirements necessary for a "credit not processed" chargeback under Mastercard Reason Code 4860. Exhibit 44 (Whiteside 49:19-50:4).

**<u>Response</u>**: **DENIED**. As with any rule-based system, there is disagreement between entities concerning the interpretation of the rules. Mr. Whiteside testified [redacted]. (Ginzburg Decl., Ex. 8 at 137:14-21). Accordingly, Chase and Citibank expressly [redacted] (*Id.*, Ex. 14 at JPM0001230, 1232, 1234, etc.; *id.*, Ex. 9). In addition, the Chase representative [redacted] (*Id.*, Ex. 6 at 270:4–271:4). Moreover, if nothing more than the credit letters from Northeast were required, there was no reason for

Friedman to have lied to Chase, Citibank, Capital One and Bank of America concerning the nature of the transactions. But he did lie nonetheless.

**<u>Statement No. 42.</u>** The Visa rules are to the same effect. Exhibit 39 at PSR-654; Exhibit 52. As is American Express. Exhibit 60.

**<u>Response</u>**: **DENIED** for the same reasons as in Response to Statement No. 41.

**Statement No. 43.** [redacted]. Exhibit 41 at 124.

**<u>Response</u>**: Admitted, though Elavon **DENIES** that the reasoning supplied by Mr. Klein is necessarily accurate inasmuch as he is acting as an advocate for the Friedmans in this action and his counsel also represents the Friedmans.

**Statement No. 44.** [redacted] Exhibit 45(Sheehan 36:10-13); Exhibit 42 (Strenge 55:15-56:3) Exhibit 43 (Stump 34:19-35:16). Yurowitz Decl. at ¶7.

**<u>Response</u>**: Admitted that the issuer determines which chargeback reason code to select, but **DENIED** that the issuer chooses what information is to be conveyed to an acquirer. Issuers communicate to acquirers the facts underlying the chargeback and any supporting documentation. (Franklin Decl. ¶ 8).

**<u>Statement No. 45.</u>** No other information concerning the nature of the transaction was provided. In response to these chargebacks, and as discussed below, Elavon fraudulently claimed that the refund letter could not be authenticated and rejected the chargebacks. Thereafter, the chargeback was submitted again this time accompanied by another letter from Northeast to Mrs. Friedman:

> Pertaining to our call today, this letter is to confirm that on Monday July 6th, our attorney Noah Shelanski has confirmed to Elavon (our credit card processor) that we did issue to you the credit memo for the refund due to you on the 15 transactions charged on 4/13/15 & 5/14/15 as highlighted on out letter to you dated 6/1/15. We understand our credit card processor may have attempted to represent these cases on their own due to our account currently being in collection status, however, we on our end have confirmed this letter to them, and we have certainly never disputed these letters. These amounts are still outstanding as of today, and we hereby acknowledge for same. We would have certainly appreciated if we could have resolved this in (sic.) easier terms, however, we do recognize that the least we can do is not to stand in your way to exercise the rights you may have for securing your credits in this unfortunate situation.

Exhibit 34 at Elavon 001352.

**<u>Response</u>**: **DENIED** because it is unclear what particular transaction Friedman is referencing. Also **DENIED** that Elavon "fraudulently" claimed that the refund letter could not be authenticated. A full exposition of this point is set forth in Response 47, below.

**<u>Statement No. 46.</u>** Elavon uses a system named ADRP ("Automated Dispute Resolution Process") to keep track of chargeback activity. Exhibit 57 (Boyden 34:6-

14). The ADRP system contains "the universe of documents and transactions and communications in connection with a chargeback." Id. (122:15-19).

**Response**: Admitted.

**Statement No. 47.** A review of Elavon's ADRP records demonstrates that in response to the chargeback claims initiated by the Friedmans, Elavon declined more than 200 of the chargeback claims purportedly because Elavon was "UNABLE TO AUTHENTICATE REFUND MEMO/AUTH SIGNATURE" or because there was "NO PRF OF CRDT RFND PRVD- NO CRDT DUE AS SRVCS WERE PRVD" or other similar grounds. Yurowitz Decl. at ¶¶8, 12, 15, 17, 19, 24, 26, 28, 34, 36.

**Response**: Admitted that Elavon did advise several issuing banks that it could not verify the authenticity of Northeast's credit letter. Elavon did so as part of its obligation to protect its merchant clients' interests. (Franklin Decl. ¶ 10). At the time, Elavon did not have confirmation that Northeast was colluding with the Friedmans to process the chargebacks. (*Id.* 19, 28). Therefore, it surmised that there was a possibility that the Friedmans forged the credit letters. (*Id.* ¶ 28). In response, Elavon received a follow-up letter from Northeast that confirmed the original credit letters were prepared by Northeast. (*Id.*, Ex. 6).

**Statement No. 48.** As a result of Elavon's response, those chargeback claims were declined and returned to the issuers. Id.

**Response**: Admitted, though the correct verbiage is that Elavon declined the chargebacks, which caused them to be transmitted to the issuers for further action, if any.

**Statement No. 49.** Elavon continued to take this position even after it was informed on July 6, 2015, by Noah Shelanski, counsel for Northeast, that the credit letters were authorized. See, e.g. Exhibit 30 (Elavon05236) (entry on 8/7/2015 represented chargeback case no. #1022724648 because Elavon was "UNABLE TO AUTHENTICATE REFUND MEMO/AUTH SIGNATURE").

**Response**: **DENIED** that Mr. Shelanski identified himself as counsel for Northeast or that he made any mention of the credit letters. (Franklin Decl. ¶ 18).

**Statement No. 50.** After the charges were represented by Elavon, most of the issuers submitted prearbitration notices. In the majority of the cases, Elavon accepted liability in response to the prearbitration notice. Exhibits 3-4, 6-7, 10, 12, 14-16, 19-20, 23, 25, 27-29, 31-32, 34, 36.

**Response**: Admitted.

**Statement No. 51.** Despite its knowledge that the chargebacks were for loans, Elavon never objected to the chargebacks on this ground. Exhibit 48 at 330-331.

**Response**: Admitted, because Elavon had no evidence that the chargebacks were for loans. Rather, all it had was a "hint" that that may be the case from Mr. Shelanski, who did not put anything in writing and refused to identify the person(s)

he was representing. (Franklin Decl. ¶¶ 18, 29). The Visa representative stated that "substantial evidence (as opposed to conjecture)" would have been required to prove that the information the Friedmans and Northeast submitted "was false or materially incomplete[.]" (Ginzburg Decl., Ex. 7 ¶ 7). Similarly, the MasterCard representative testified [redacted]. (*Id.*, Ex. 8 at 152:5-20). Due to the Friedmans' collusion with Northeast, Elavon had neither substantial nor unequivocal evidence of the falsity of their submissions (and did not have that evidence until 2019). (Franklin Decl. ¶¶ 29-30). As a result, it decided that seeking arbitration under Visa or MasterCard auspices would have been futile. (*Id.*).

**<u>Statement No. 52.</u>** Even after Elavon commenced this litigation, it still failed to object to the chargebacks on the grounds that they were loans, rather it objected to the chargebacks on the ground that "NO PROOF OF CREDIT REFUND PROVIDED NO CREDIT DUE AS SRVCS." Yurowitz Decl. at ¶30.

**<u>Response</u>**: Admitted. Even after this litigation began, Elavon did not have substantial or unequivocal evidence that the transactions were loans.

Dated: August 22, 2022

Respectfully submitted,

**THE GINZBURG LAW FIRM, P.C.**

/s/ *Daniel Ginzburg*
By: Daniel Ginzburg
Mailing Address
200 Village Center Drive, Unit 7045
Freehold, NJ 07728
(732) 284-3841 (tel)
daniel@ginzburglawfirm.com
*Counsel to Plaintiff Elavon, Inc.*